Filed 3/7/17

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION ONE

THE PEOPLE,

      Plaintiff and Respondent,

v.

JOSE VEGA-ROBLES,

      Defendant and Appellant.

A137121

(Contra Costa County
Super. Ct. No. 05-080176-1)

## INTRODUCTION

A jury convicted Jose Vega-Robles of conspiracy to sell controlled substances, attempted robbery, and two first degree murders, and found true gang and firearm enhancements. He appealed, raising numerous issues, including a challenge to the gang experts' testimony on hearsay and confrontation clause grounds. In an opinion certified for partial publication filed on May 5, 2015, we reversed the conviction for the murder of Darrell Grockett for instructional error per *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*). We ordered that on remand, the People had the option of accepting a reduction of defendant's conviction to second degree murder or retrying the first degree murder charge under theories other than natural and probable consequences. (*Id.* at p. 168.) We rejected defendant's other appellate challenges to the judgment.

On July 29, 2015, the Supreme Court granted defendant's petition for review and deferred further action pending consideration of *People v. Sanchez* (review granted

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts V, VII, XI, XII, XIII, XIV, and XV of the Discussion section.

Sept. 5, 2014, S216681).  (*People v. Vega-Robles*, review granted July 29, 2015, S226913.)  On September 21, 2016, the Supreme Court transferred the cause to this court for reconsideration in light of the decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).  Thereafter, we requested and received supplemental briefing from the parties on the application of *Sanchez* to this case.  Having considered the supplemental briefs, we conclude the testimony of gang experts Todd Tribble and Robert Brady, and the instructions on expert testimony, violated *Sanchez* in certain respects, but the errors were harmless beyond a reasonable doubt.  (*Chapman v.  California* (1967) 386 U.S. 18).  We therefore reinstate our original judgment reversing in part and affirming in part, and remanding with instructions.

## STATEMENT OF THE CASE

In 2008, the Contra Costa County District Attorney filed an indictment charging defendant and four others with conspiracy to sell narcotic and non-narcotic controlled substances in violation of Health and Safety Code sections 11352 and 11378, from January 1, 2004, until November 30, 2005.  (Pen. Code, § 182, subd. (a)(1)); count 1.)[1]  The indictment alleged 19 overt acts under count 1.  Overt act Nos. 1 and 2 alleged the sale of methamphetamine by defendants to Robert Lott and by Lott to Tara Sander in 2004.  Overt act Nos. 3, 4, 5, and 6 alleged a plan between defendants and Coby Phillips to kill Darrell Grockett on October 7, 2004.  Overt act Nos. 7 through 15 alleged a plan between defendants and Ricardo Ruiz to kill Marcelino Guzman-Mercado on December 3, 2004.  Overt act No. 16 alleged the burglary of Guzman-Mercado's residence by defendant and two other codefendants. Overt acts 17 through 19 involved defendant's nonfatal shooting of Jose Hernandez on February 21, 2005, with the assistance of Thomas Covey.

---

[1] All further unspecified statutory references are to the Penal Code.

2

The indictment also alleged the conspiracy described in count 1 was committed to benefit two criminal street gangs, Family Affiliated Irish Mafia (FAIM) and Sureños. (§ 186.22, subd. (b)(1).)

In addition, the indictment alleged two counts of murder (§ 187, subd. (a); counts 2 [Grockett] & 3 [Guzman-Mercado]), attempted robbery (§§ 211/212.5/664; count 4), residential burglary (§ 459; count 5), grand theft (§ 487, subd. (a); count 6), and attempted first degree murder (§§ 187, subd.(a)/664; count 7 [Hernandez]). The indictment alleged counts 2 through 6 were committed to benefit the FAIM and Sureños criminal street gangs. (§ 186.22, subd. (b)(1).) And, in connection with counts 2, 3, and 7, it alleged a principal intentionally used and discharged a firearm, causing death or great bodily injury, for the benefit of the Sureños and FAIM street gangs. (§ 12022.53, subds. (b), (c), (d) & (e)(1)).

On March 26, 2012, the court granted defendant's motion to sever count 7, the attempted murder charge. The overt acts related to that count were not severed.

On June 8, 2012, the jury convicted defendant of counts 1 through 4 (conspiracy, murders of Grockett and Guzman-Mercado, and attempted robbery of Guzman-Mercado), and found both murders to be of the first degree. The jury found true the allegations that defendant committed (1) the conspiracy for the benefit of the Sureños and FAIM gangs, (2) the Grockett murder for the benefit of the FAIM gang, and (3) the robbery and murder of Guzman-Mercado for the benefit of the Sureños gang.

With respect to the firearm allegations, the jury found true that a principal party intentionally discharged a firearm during the Grockett murder and that the offense was committed for the benefit of the FAIM gang. The jury found the cognate allegation *not* true with respect to the Guzman-Mercado murder and the Sureños gang, but *did* find true the allegation a principal party used a firearm and committed the offense for the benefit of an unspecified criminal street gang.

3

The jury acquitted defendant of counts 5 and 6, residential burglary and grand theft, respectively.

The court sentenced defendant to an indeterminate prison term of 85 years to life. Defendant filed a timely notice of appeal.

## STATEMENT OF FACTS

### I. Prosecution Evidence.

### A. Defendant's drug trafficking operations.

In 2004, Ricardo Ruiz lived in the Richmond/San Pablo area and knew Juan Delatorre, defendant's cousin, Primo, his brother, Sergio, and the brothers Rudolfo and Alejandro Figueroa. Before and during 2004, Ruiz was affiliated with Richmond Sur Trece (RST), a Sureño gang. Delatorre was also involved in RST, and Rudolfo Figueroa was affiliated with it to the same extent Ruiz was. Ruiz believed Alejandro and Rudolfo Figueroa were also affiliated with the Sureños.

Ruiz met Sergio Robles before he became acquainted with defendant or Primo. Ruiz's primary relationship was with Sergio. Sergio was involved in selling "crystal" and "coke," which he obtained in Los Angeles. Defendant was involved in drug sales with Sergio. Defendant's job was "selling dope." Ruiz knew this because "they used to come to my house all of the time and did their business there and I seen it." Also, defendant had all kinds of cars: "Mercedes, Jaguars, Beamers, . . . Escalades."

Ruiz worked for both Sergio and defendant. He assisted them in their drug sales by picking up and delivering the drugs. He facilitated a drug sale from Sergio to Coby Philips. However, he did not deal drugs with or buy drugs from Coby Philips. Both Sergio and defendant asked Ruiz to transport drugs from Southern California to the north, but Ruiz declined to do so.

Ruiz also acquired methamphetamine from defendant, Sergio and others, which he resold in small quantities. Defendant and Sergio did not share their drug profits with Ruiz. Ruiz did not share his profits from these sales with anybody. Primo was also

involved in the drug sales.  RST members were involved in selling crystal methamphetamine and marijuana.

Defendant was not in RST.  He worked with his brother and "was higher on the food chain than a street dealer."  In 2003 and 2004, defendant and his brother dealt in pound quantities.  According to Ruiz, Delatorre was using and selling drugs at the same time.  Initially, he got drugs from Ruiz, but eventually he got them directly from defendant and Sergio and became part of the distribution ring.

Ruiz knew who Coby Phillips was because Phillips's father and grandparents lived on the same street in San Pablo as Ruiz.  However, he did not associate with Philips because Hispanic and White groups do not associate.  Phillips had a leprechaun or a shamrock tattooed on his face near his eye.  Ruiz was present when Sergio talked to Phillips about a drug transaction.  Ruiz went with defendant and Sergio a couple times to Phillips's house in Vallejo to drop off drugs.  Ruiz also went with Primo to sell drugs at different places.  On one occasion, Ruiz guarded a car containing drugs on Bush Street in San Pablo at the request of defendant and Sergio.  Ruiz went with defendant a couple times to collect a debt Delatorre owed for a pound of methamphetamine.

Stacey Taylor married Coby Phillips in November 2003.  She had known him since she was 13.  She knew defendant as Phillips's friend "Carlos," who supplied him with methamphetamine, which Phillips resold to other drug dealers.  Phillips was a member of the FAIM gang, as were Thomas Covey, Matt Donohue, Jason Donohue, and about 100 others.  Phillips had shamrock tattoos on his face and shaved head.  The large shamrock on the back of his head had the letters FAIM in the middle of it, and he had a swastika tattooed on the top of his head.  Taylor concluded drug dealing was the primary activity of the gang.  Taylor knew Phillips obtained methamphetamine from defendant and Sergio (as well as a couple of others) in 2004 because she was with Phillips and a lot of the time it was at their house.  Phillips bought varying amounts of product from defendant, sometimes as much as 10 pounds.  She did not directly know

5

where defendant got the methamphetamine, but she knew it came from Mexico. Phillips resold "sales quantities" (as opposed to "street level quantities") of the drugs, typically to other FAIM members.

Taylor sometimes counted the drug money for Phillips. Between 2003 and 2005, the most cash Taylor had ever seen Phillips with in connection with drug sales was about $100,000. Taylor knew Phillips also received guns as payment for drugs because she was present when Phillips discussed drugs for guns with defendant and Sergio. Taylor knew that her brother, Clayton Cates, transported drugs because she was there when he left and when he returned. She also went with Phillips a few times to drop off or pick up a pound of drugs.

Taylor understood she was testifying under a grant of immunity stemming from a murder prosecution in Solano County.[2] She had lied to the police when she provided Phillips with an alibi for the Grockett murder. She had previously committed perjury in one jury trial to exonerate Phillips from domestic violence charges and at another jury trial in Solano County. She lied at the Solano County trial because she was afraid of retaliation if she testified truthfully. She felt safe after relocation and did not need to worry about something happening because of her testimony in the current case. She received $1,500 a month for rent and other incidentals for herself, her four children, and Tim Covey, with whom she still lived, from the state's witness relocation fund. Her brother, Clayton Cates, pleaded guilty to voluntary manslaughter and received a one-year jail sentence in the Solano County case. Cates also receives relocation money.

---

[2] In 2009, 2011, and 2012, Taylor testified in three Solano County murder trials concerning "the Verducci shooting." She entered into an immunity agreement after the first trial in 2009. The agreement involved relocation for her and Tim Covey if she agreed to tell the truth. She was "not sure" if the Solano County agreement "carrie[d] over" to Contra Costa County because she "never was told that," but she did not think she was saying anything she could "get prosecuted for."

6

Taylor began a romantic relationship with Tim Covey a couple of months after Phillips went to jail on the current charges. Taylor and Phillips got back together after Phillips was released from jail for lack of evidence, but then separated for good in early 2007 after the domestic violence incident on New Year's Eve in 2006. At that point, she and Tim Covey moved away and stopped associating with defendant and the rest of the group because everyone was upset about her relationship with Covey. However, she remained on friendly terms with Jamie Beckwith, defendant's girlfriend.

Cates testified that from 2004 to 2007, Phillips made money by selling methamphetamine, and Cates was "involved in some way with it." Cates participated in Phillips's drug trafficking activities. According to Cates, Phillips obtained his methamphetamine from defendant and Sergio. Cates met defendant and his brother through Phillips. On three or four occasions, Cates transported drugs from Los Angeles to the Bay Area for Sergio. Sergio provided Cates with the car he drove to Los Angeles. Cates would leave the car at a predetermined spot in Los Angeles and pick up the car later that day. He then drove it to Sergio's house in Benicia. Cates saw people take drugs from the panels inside the car. Cates was paid about $3,000 per trip. Cates knew Phillips got his drugs from Sergio because Cates heard Phillips talking about it. Cates got drugs from Phillips and delivered them to Stephen Buchanan, whom he knew through Phillips.

Cates knew Phillips and the Covey brothers were in the FAIM gang because of their tattoos. Phillips had shamrocks tattooed on his face and head. Thomas (Bubba) and Timothy Covey had FAIM tattooed on their arms. Buchanan was also a gang member and had gang-related tattoos. Cates denied he was ever a member of FAIM. He did not have any tattoos. In 2008, Cates was arrested on drug-related charges involving Cates's delivery of drugs to Buchanan. He was also "in trouble" on a 2007 murder charged out of Vallejo that also involved his sister. Cates pleaded guilty to drug trafficking in the Buchanan matter, received a suspended sentence of 11 years, and was placed on

7

probation. He was given immunity to testify in the Vallejo matter. He was also in witness relocation.

Timothy Covey was a member of the FAIM gang, which his brother Tom cofounded. Covey had several tattoos on his body, including one on his arm that said FAIM and one on his shoulder that said FAIMLY. The gang recruited members through the prison system. Belonging to the gang made "things a lot easier" for Covey when he was in Contra Costa County jail. In late 2004 to early 2005, Covey personally knew about 30 FAIM gang members.

The purpose of forming the gang was to use "muscle" to "help our drug trade." Covey knew that Phillips purchased drugs from defendant when he was not in jail because he witnessed the transactions. Covey started purchasing methamphetamine directly from defendant after Phillips went to jail. Defendant would "front" Covey a pound or two of methamphetamine at a time which Covey would then resell to "[m]ostly sellers," and then pay defendant out of the sales proceeds. At the time, Covey considered defendant "family." By the time of trial, Covey no longer considered him a friend. Covey still owed defendant money for drugs, but he had made no effort to pay him back. Covey testified that if defendant were released, "we'd have to deal with it[,] obviously."

Covey had a falling out with some members of FAIM after he became romantically involved with Stacey Taylor, Phillips's wife.

In the same Solano County case in which Stacey Taylor testified, Covey refused to testify against a FAIM member. He made no deal for immunity from prosecution in Contra Costa County. "I'm just telling the truth." The United States government relocated him and his family to a different state after he began to receive threats. His rent and incidental expenses were paid by Solano County. He felt he needed to relocate before he could testify.

8

Jamie Beckwith was defendant's girlfriend from 2003 to 2007, and she had two daughters with him. At that time, defendant did not have a job; he sold drugs which he told her, and she believed, he obtained from Mexico. He was known as Carlos or by the street name Calacas. She knew his brother, Sergio, was also involved in selling drugs from being around them all of the time and overhearing conversations. Carlos and Sergio worked together, but defendant was "more of the leader." Sergio sold more cocaine, whereas defendant sold crystal methamphetamine by the pound. Their cousin, Primo or Josue, worked for defendant in the drug business, delivering and picking up "money and stuff like that." The largest quantity of methamphetamine Beckwith heard defendant discuss was 30 pounds, and the greatest amount of money was around $400,000.

Beckwith also knew Coby Phillips, who bought drugs from defendant. Phillips did not hang out with people who were not White or Irish, except defendant. Timothy Covey associated with Phillips. After Phillips went to jail in late 2004 or early 2005, Phillips had Covey "take care of [Phillips's] business and take care of his household duties," and Covey started doing drug transactions with defendant. Beckwith knew Ricardo Ruiz "through [defendant's] people that he knew and met up with." Beckwith socialized with Phillips's wife, Stacey. Both Tim Covey and Stacey were around when drugs were being discussed.

Beckwith saw defendant, Sergio, Primo, and Tim Covey carrying guns. In 2004 and 2005, defendant "always" carried a gun, which he kept in the center console of his vehicle.

Beckwith knew, by "talking to everybody," that Cates picked up drugs somewhere in Los Angeles for both defendant and Sergio.

In 2005, defendant told Beckwith there was a warrant for his arrest, and he left for Mexico. Covey later drove Beckwith to Mexico to see him. Defendant was

9

arrested in 2007 when he returned to the United States. Taylor and Covey took Beckwith to see him in jail in Petaluma.

## B. Murder of David Grockett—October 7, 2004.

On October 7, 2004, then Contra Costa County Sheriff's Detective[3] Shawn Pate noticed a Chevrolet pickup truck parked at a pullout along Crockett Boulevard. The truck was locked; the keys were inside the truck. Darrell Grockett's body was lying face up on the ground behind it. Grockett had tattoos on his forehead and upper torso. He had $2,000 in his left front jacket pocket. He had gunshot wounds to the mouth, finger, and left torso. Eleven cartridge casings and six bullets were recovered from the scene. Some of the rounds had passed through the front of the body into the dirt beneath. Eleven cartridge cases, 10 bullets, and one bullet fragment were submitted to the crime lab for ballistics analysis. The analysis established three rounds were fired from a .38 or .357 caliber firearm and seven rounds were fired from a 9-by-19 millimeter gun. From the blood stains at the scene, it appeared that Grockett first was shot while standing and then shot additional times while lying on the ground.

### i. Events Leading Up to the Murder.

Stacey Taylor testified Darrell Grockett was a friend of Phillips who had attended their wedding. Grockett had shamrock tattoos and was gang-affiliated with the Aryan Brotherhood. Taylor witnessed drug deals between Phillips and Grockett. Grockett would come to their house and hand Phillips money and receive drugs in return. In October 2004, both Grockett and Phillips were out of custody. Phillips told Taylor they had a disagreement over drugs because Grockett did not want to pay what Phillips was asking.

Around 7:00 or 8:00 p.m. on October 7, 2004, Taylor and Phillips went to a restaurant overlooking the Carquinez Bridge known as The Dead Fish. Before they left for the restaurant, Phillips told Taylor he was going to meet with Grockett. Phillips said

---

[3] At the time of trial, Pate was an inspector with the district attorney's office.

that he and the other people he was meeting at the restaurant were going to go shoot Grockett. According to Taylor, when she and Phillips arrived, defendant was there with his wife Jamie Beckwith, Sergio, and Primo.[4] Phillips, defendant, Sergio, and Primo left the restaurant a short time later. According to Taylor, she and Beckwith remained at the restaurant.

### ii. Events After the Murder.

About 45 minutes to an hour later, Phillips, defendant, and the others returned to the restaurant. Taylor and Phillips went to a house in Rodeo, where Phillips wrapped some things in rags and gave them to a woman named Amy Abeyta. Taylor knew the items were the guns used to shoot Grockett because Phillips told her he had to get rid of them. They did not stay at their home in Vallejo that night but, instead, went to a hotel in Vacaville. The next day they went to Taylor's parents' house in Shingletown in Northern California, where they had sent their children a few days earlier.

Phillips later asked Taylor to attend Grockett's funeral to avoid suspicion. They subsequently moved to a house in Cordelia, which Phillips rented from Sergio, who supplied Phillips with drugs. Phillips put bulletproof glass over the sliding glass door and windows. Defendant and Sergio both visited the Cordelia house.

In 2004, Sally Sinclair and Darrell Grockett came up with a plan to sell methamphetamine together. Grockett had a connection with someone for getting methamphetamine, and Sinclair was going to buy five pounds of methamphetamine from him for $35,000. In late September or early October 2004, she gave him a $16,000 advance, but the deal was postponed.

---

[4] Beckwith recalled it slightly differently. She testified that once, on a date she did not recall, defendant dropped her off at The Dead Fish restaurant, and Coby Phillips dropped Taylor off. The two men then left together. She told Pate that in the days leading up to her meeting with Taylor at The Dead Fish, she heard Coby and defendant having a conversation about a drug deal that was less casual and more serious than most of their conversations about drug deals.

A few days later, Grockett came to her house with his girlfriend, Tara. Sinclair gave him another $13,000. Around 8:00 p.m., Grockett's cell phone rang and he stepped outside to take the call. Shortly thereafter, he came back inside and said he would be right back. He left without Tara, without the money, and without saying where he was going. Sinclair and Tara waited for him for hours at a local bar. Tara tried to call Grockett numerous times without success. At some point, Sinclair spoke to Grockett's roommate, Matt Baker, on the telephone. Baker said Grockett was dead.

Sometime in October 2004, Ruiz had a conversation with Primo in front of Ruiz's house on Bush Street in San Pablo about a shooting Primo witnessed the night before. Primo was scared and shaken up about what he saw. He said his cousin Calacas and Coby shot a man near Rodeo on Highway 4. Primo said the man they shot had tattoos on his face. At the time Primo was telling Ruiz about the shooting, defendant and Coby were standing across the street. After the conversation, Ruiz left and Primo rejoined defendant and Cody.

Timothy Covey testified he heard defendant and Primo joking in Spanish about Grockett's death after it happened. They were talking "about the guy with tattoos all over his face and making gestures. Like, bang, bang, bang." They made shooting gestures with their hands. Covey knew that Grockett had tattoos all over his face. According to Covey, the day after the Grockett shooting, defendant's and Phillips's families left town for Stacey Taylor's grandmother's house. When defendant and Phillips returned after the Grockett killing, "everybody was pretty much let known that we needed to start carrying guns and we were all hanging around Coby's house in Vallejo." By "we," Covey meant a close-knit group of FAIM members who were Phillips's associates. Shortly thereafter, Phillips moved to a house in Cordelia and put thick Plexiglas on all the sliding glass doors.

12

## C. Murder of Marcelino Guzman-Mercado—December 3, 2004.

In response to a call at 9:40 p.m. on December 3, 2004, Contra Costa County Sheriff's Deputy Xavier Shabazz was dispatched to 5955 North Arlington Boulevard in San Pablo, where he located Guzman-Mercado's body. The victim's shirt and jacket were pulled up, exposing his torso. He had a gunshot wound in his left side under his armpit. There were also abrasions on the victim's back and he was missing a shoe. The deputy located a matching shoe in the middle of the street about a half mile south of the body.

Guzman-Mercado died of a single gunshot wound to the chest, which entered his chest and exited his back. He had bruises and abrasions on his torso, face, and chest consistent with impact on a rough, stony, or gravel surface. He had $680 and his house keys on his person, as well as a phone number with a 650 area code on his belt. The phone number led to a relative and the eventual discovery of Guzman-Mercado's address.

Guzman-Mercado lived in an apartment complex at 2389 Aberdean Way, Richmond. Police used the house key found on Guzman-Mercado's body to enter the apartment. The exterior door frame appeared to have been recently repaired and freshly painted. A crowbar or tire iron was on a countertop inside.

### i. Events Leading Up to the Murder.

Sometime in December 2004, defendant was at Taylor's house in Fairfield when he said he needed to get some money for Christmas and that he was going to rob someone of drugs. Defendant's girlfriend, Jamie Beckwith, and possibly Tim Covey, were present during the conversation. According to Taylor, defendant said "he knew somebody that had . . . either some money or some drugs that he could take [rob] from them."

On December 3, 2004, Ruiz was at home drinking beer with Rodolfo Figueroa when Delatorre and Primo pulled up in a gold Lexus. The car was registered to Ruiz,

13

although he did not own it. He drove it only for drug trafficking business when directed to by Primo. He did not use the car for his personal pleasure.[5]

Ruiz and Figueroa "hopped" in the car to go for a drive, but Primo drove to a Union 76 gas station (76 Station) on the San Pablo Dam Road, where defendant and another person were waiting for them in a white Suburban SUV. Defendant was the passenger. Primo and Delatorre got out of the car and spoke to defendant. When they returned to the Lexus, Primo told Ruiz to drive. Primo and Delatorre got in the Lexus, and defendant remained in the Suburban. Primo asked Figueroa to wait at the 76 Station and Figueroa got out of the car. Primo told Ruiz to pick up some drugs, and he drove to a nearby car wash to wait for the arrival of Guzman-Mercado, whom he did not know. Defendant was never in the Lexus.

After Guzman-Mercado got into the back seat of the Lexus, Ruiz drove off. Primo, who was in the front seat, turned around to speak to Guzman-Mercado. They argued in Spanish, and Ruiz heard someone say, "Let me see it." Suddenly he heard a gunshot from the back seat. Ruiz stopped the car in shock and looked back to see that Guzman-Mercado was shot, and Delatorre had a gun in his hand. Ruiz kept driving and when he next looked back the door was open and Primo and Delatorre were trying to eject Guzman-Mercado's body from the car, but Guzman-Mercado's foot was caught under the seat and his body was being dragged along the pavement. Ruiz stopped the car; Primo got out and extracted Guzman-Mercado's body from the car. Primo patted down Guzman-Mercado's body, looking for "house keys," but did not find any. They drove off, and Primo made a call from his cell phone.

### ii. Events After the Murder.

A short time later, they met defendant and others at the Wildcat Canyon Apartments, from which defendant sold drugs and where some of defendant's relatives

---

[5] Ruiz explained that Sergio had connections with the Department of Motor Vehicles and was able to register the car in Ruiz's name without his knowledge. Later, Primo and defendant sold the car to Alejandro Figueroa.

lived.  The apartments were around the corner from the 76 Station and a couple blocks away from the location of the shooting.  The others drove off, but Ruiz and Rodolfo Figueroa stayed until Alejandro Figueroa picked them up and dropped Ruiz at his home.

The next day, Ruiz was eating with a friend at the Portumex Restaurant on 23rd Street in Richmond when defendant, Sergio, and Primo came into the restaurant to talk to him.  Sergio told Ruiz, "Don't worry about it. Just don't say nothing."  Defendant said, "Good job. Don't worry. You'll be fine."

About a week later, Delatorre told Ruiz the incident "wasn't supposed to happen like that. They were just going to tie him up."  Ruiz asked Delatorre what happened after Ruiz was dropped off at the Wildcat Canyon Apartments.  Delatorre said "they" went to the victim's apartment and "he"— Delatorre— kicked in the door.  He told Ruiz "he went in and got what they went for," which was "pounds of crystal meth."  Delatorre did not say who went to the apartment with him.  He said defendant kept the drugs. Delatorre explained to Ruiz he "paid his debt" to defendant by participating in the transaction.  Ruiz knew Delatorre owed defendant money for "crank" defendant had fronted to him because Ruiz went with defendant to collect the debt from Delatorre a couple of times.

After the Guzman-Mercado shooting, Ruiz maintained his association with defendant, Sergio, and Delatorre and continued to make drugs sales, but he tried to "keep [his] distance."

Ruiz assumed Guzman-Mercado was a drug dealer because he was supposed to pick up a package from him.  Picking up things or people or making deliveries and dropping things off was a "standard thing" that Ruiz would do with defendant, Sergio, and Primo "[o]nce in a while."  While driving, he assumed the incident with Guzman-Mercado was going to be just another drug transaction because drug transactions were something he would typically do with Primo, Delatorre, or defendant.

At some point in December after the murder had occurred, defendant told Stacey Taylor he got the money or drugs and that he had shot the guy in the car, or inside the car. Defendant described the car as a Lexus.

In December 2004, defendant told Covey about shooting someone in Primo's Lexus. According to Covey, defendant and Primo "were laughing and joking about how he was hanging out of the car and they were shooting him as they were going down the road."

They said they had to get rid of Primo's car, which was a Lexus. They did not say who did the shooting. Covey recalled, "It was close to Christmas and it was hard times and everybody was trying to figure out a way to make money and I was under the impression that it was a robbery" because "[t]here was no dope around and nobody had no means of making money and he, Coby, had said that they had a plan to make money and that's all we heard."

Beckwith overheard a conversation between defendant and Primo and Rick Ruiz about pushing someone out of a car. Defendant asked, "Did you finish it or did you do it?" Primo said they shot the person but he was not dead and they had to push him out of the car. She thought they used an older model Lexus for the job.

### iii. Ruiz Is Arrested for the Guzman-Mercado Murder.

Ruiz was arrested on March 5, 2007, for the Guzman-Mercado murder. At the time, Ruiz had heard Sergio and defendant had been arrested, and he knew people were talking about the Guzman-Mercado murder. The police questioning led him to believe he was arrested because defendant had implicated him, Delatorre, and the Figueroa brothers, Rudolfo and Alejandro, in the Guzman-Mercado murder, although he later learned defendant meant a different Alejandro. After reading the police reports, he knew defendant and Sergio had ratted him out.

Ruiz was charged with the murder. Ruiz gave police a statement on March 5. On the advice of counsel, Ruiz admitted to the prosecutor and Inspector Pate he was in the

16

car when Guzman-Mercado was killed. Ruiz admitted he initially told law enforcement officers that Primo shot Guzman-Mercado, because Primo was in Mexico and he wanted to deflect suspicion from his friend Delatorre. However, Ruiz eventually identified Delatorre as the shooter.

On September 11, 2007, he gave police another statement in which he told police about Primo's statements concerning the Darryl Grockett murder. In that statement, Ruiz told police Primo said Grockett was trying to get Coby Phillips killed or trying to kill him. According to Ruiz, Primo said two shooters―defendant and Coby―were shooting at Grockett and "they" all had guns. He also told law enforcement about the Hernandez shooting. According to Ruiz, Hernandez was affiliated with "northerners," the rivals of Sureños.

Ruiz agreed to testify for the prosecution. He entered a plea agreement in which he was to serve three years in a local facility. As part of that deal, Ruiz also testified at Delatorre's trial and before the grand jury.[6] He was supposed to tell the truth. Since he started testifying in 2008, Ruiz had received approximately $63,000 and relocated with his family.

Detective Pate recalled that he and Detective Goldberg interviewed Ruiz at the Martinez jail in early 2007. Goldberg suggested Delatorre was already talking and told Ruiz that if he was "honest" about what he and other people did, Ruiz would not be booked into jail. The officers did not give Ruiz police reports to read or say defendant had been talking about Ruiz. At that point, Ruiz admitted that he was driving the car when Guzman-Mercado was shot.

Ruiz mentioned a Chevy Tahoe truck was also involved, but maintained he did not know the occupants. Eventually, Ruiz identified a photograph of defendant, who went by the nickname Calacas, as one of the people in the truck.[7] Ruiz said that earlier that

---

[6] Ruiz testified at two grand jury proceedings and two Delatorre trials.

[7] At trial, Ruiz identified defendant as Calacas, the person in the truck.

17

evening, Primo had talked about "jacking" (i.e., robbing) Guzman-Mercado. Eventually, Ruiz said Delatorre shot Guzman-Mercado. At the end of the interview, Ruiz was still denying he had a relationship with defendant. Ruiz and Delatorre were the only ones charged with the Guzman-Mercado murder at that time.

Ruiz was reinterviewed in the fall of 2007. An attorney was present during part of the interview. During this interview the police learned for the first time about the Hernandez shooting and about Ruiz's conversation with Primo about the shooting off Highway 4.

According to Beckwith, a few months after the shooting in the car, defendant left for Mexico because a warrant for his arrest had been issued. Later, Timothy Covey drove her to Mexico to meet him. At some point, defendant returned to the United States and was eventually arrested in Petaluma in 2007.

**D. Attempted Murder of Jose Hernandez—February 21, 2005.**

On February 21, 2005, Jose Hernandez lived with his daughters at 1815 Roosevelt Avenue, Richmond, in one unit of a four-unit apartment complex where his parents also lived. He was walking downstairs with his sleeping daughter in his arms when he was shot three times. He identified defendant as the shooter.

Hernandez lived next door to Alejandro Figueroa, who was having a party that day. A wooden-slatted cyclone fence separates the two properties. Hernandez had to walk outside to take his daughter downstairs to his apartment and saw defendant urinating on the fence. Hernandez deposited his daughter at his apartment. On his way back to his mother's apartment, he heard defendant say, "[H]ey, just stop and look to your left." Hernandez turned to see defendant about six or seven feet away pointing a gun at him. Defendant smiled and shot Hernandez in the left hand, the hip, and the calf. Hernandez yelled for help and a number of family members came to assist him. Police and paramedics arrived shortly thereafter. A live .38-caliber bullet was found at the scene. Police officers observed four suspected bullet holes in the fence between the two

18

residences. Hernandez subsequently identified defendant from a photographic lineup at the hospital the next day. He recognized defendant as someone he had seen once or twice before.

Hernandez knew Alejandro Figueroa's brother, Rudolfo. He also knew Ricardo Ruiz, who used to go to Alejandro's house "lots" and went to Hernandez's house "sometimes." He was not sure if defendant was the person known as Calacas, but he was sure defendant shot him. Initially, Hernandez went +back to living at his apartment on Roosevelt. However, a couple of years later, the police contacted him out of the blue. At first he did not want to talk to them or testify, but now felt safe to testify, because he got help to move out of the Roosevelt Avenue residence.

Hernandez testified that he had previously asked Alejandro to sell him cocaine, and Alejandro had arranged for him to buy the drugs from defendant; that was when Alejandro told Hernandez who defendant was. On that day, he also saw a gun defendant was carrying in the car. He had seen defendant at Alejandro's house a couple times.

Alejandro Figueroa confirmed he hosted a family barbeque at his house on February 21, 2005, which was attended by Rudolfo and Ruiz. Alejandro knew defendant as "Calacas" and "Carlos" and identified him in court. Defendant showed up at the barbeque uninvited. He first passed by the residence in a Cadillac, in which he was a passenger. The car went around the block and, shortly thereafter, defendant walked up to Alejandro and asked if he could urinate on the side of the house. Alejandro said he did not mind, and defendant walked to the side of the house. Suddenly, Alejandro heard shots and saw defendant come out running. He was holding a gun. Defendant was the only one on the side of the house when the shots were fired. His friend and neighbor, Hernandez, had been shot. The police came, but Alejandro did not tell them what he saw because he was scared.

According to Ruiz, Alejandro invited him to the barbecue. Primo showed up later, as did defendant. Defendant was dropped off by one of Coby's friends, Bubba, who was

driving a Cadillac.[8] He looked serious. He said hello to Alejandro and then went to the side of the house closest to a fourplex next door. Ruiz heard gunshots and saw defendant start running, then hop a fence. Ruiz knew Hernandez, who lived in the fourplex. A few weeks earlier, Ruiz heard Sergio say that the man who lived at the apartments (i.e., Hernandez) was "snitching."

At that time, Alejandro owned a gold Lexus he had purchased from Ruiz. Before he bought it, he had seen Primo driving it with Ruiz. He later learned from a newspaper account that the Lexus had been used in the Mercado-Guzman shooting.

In March 2008, Alejandro was indicted for conspiracy, robbery, burglary, and two murders, one of which involved Guzman-Mercado. He was facing life in prison. He believed he was indicted for the Guzman-Mercado murder because defendant told the police someone named Alejandro was responsible for it. After he learned that, he spoke to police for the first time about the Hernandez shooting.

Alejandro pleaded no contest to a misdemeanor violation of section 32, accessory to a crime; the remaining charges were dismissed. He was sentenced to time served. He was not the Alejandro involved in the shooting of Guzman-Mercado and he was not a gang member. So far as he knew, in 2004 and 2005, Ruiz used to hang around with the RST gang, but he did not know if Ruiz was a gang member.

On February 21, 2005, Clayton Cates went from his sister's house in Cordelia to Bush Street in Richmond with defendant in a silver Cadillac. Tim Covey was driving. They parked on the street in a residential neighborhood and defendant got out of the car. Cates and Covey stayed in the car. Defendant returned about 45 seconds later holding a gun. He appeared nervous and said emphatically, "Go" or "Let's leave." They left, returning to his sister's house. A couple weeks later, defendant said he had shot "the guy that snitched on him."

---

[8] Tim and Tom Covey shared similar builds, hair color, and head shape, and "for a long time Timmy and Bubba were the same person to some people."

20

According to Stacey Taylor, in the late afternoon of February 21, 2005, defendant, Tim Covey, and Cates were at Taylor's home. The three drove off. When they returned, Covey and Cates seemed nervous. Defendant was excited; he said he had "shot the rat." Sometime before that day, defendant said that Sergio had "found out who was telling."

Timothy Covey testified that on February 21, 2005, he met defendant at Stacey Taylor's house in Cordelia, where Covey was living at the time. Defendant came with his girlfriend, Jamie. Phillips was in jail. Defendant asked Covey to give him a ride to collect some money and directed him where to go. Covey drove Sergio's silver Cadillac to Richmond. Clayton Cates went with them. Defendant directed Covey to park on a street in a residential neighborhood, and defendant jumped out and went around the corner. About five minutes later, defendant returned with a gun in his hand. He told Covey to "[g]o," and Covey "[w]ent. Drove fast." They returned to Cordelia. A few months earlier, Covey heard defendant say a "rat" was informing on him or his brother. A couple days later, defendant said, "I got the rat." At some point, defendant told Covey that Sergio knew "who the rat was."

A short time after the shooting occurred, Sergio told defendant in Covey's presence that defendant was going to be indicted for murder. Defendant then fled to Mexico. About two weeks later, Covey drove Jamie Beckwith to Rosarito Beach, Mexico, where they met defendant. Covey saw defendant after he returned to the United States, but he was not aware when defendant returned because at the time he was not on "talking terms with anybody . . . directly in the gang" due to his romantic involvement with Stacey Taylor.

**E. Gang testimony.**

Vallejo Detective Todd Tribble testified as an expert on street gangs, generally, and White street gangs and White prison gangs, specifically. In addition to receiving hundreds of hours in formal and informal training, Tribble had interviewed numerous gang members belonging to FAIM, a White supremacist gang. The symbol used by the

21

gang is a shamrock, and they associate themselves with the color green. The Aryan Brotherhood, a prison gang, also uses the shamrock as a symbol.

FAIM boasts more than 60 members. Tribble opined that FAIM was a criminal street gang and that its primary activity was the sales of significant quantities of methamphetamine. FAIM members interact with other groups and persons in the Bay Area criminal subculture to obtain their methamphetamine. Members of FAIM are involved with firearms, often possessing them illegally. Gang members regularly carry firearms because of the violent nature of drug trafficking.

Coby Phillips, Matthew Donohue III (Mattie Boy), Jason Donohue (Matthew's brother), and Thomas Covey (Bubba) founded FAIM in 1995 or 1996 in west Contra Costa County. Phillips and Matthew Donohue later expanded the gang in the state prison system.

Coby Phillips sported a small shamrock tattoo on his right cheek and a large shamrock tattoo with the letters FAIM tattooed inside the shamrock covering the back of his head. Phillips was validated as a member of FAIM by the California Department of Corrections in 1998. He was also associated with the Aryan Brotherhood. Richard Ahlquist, Timothy Covey, Steve Buchanan, and Scott Schweiger (known as Shovelhead) were members of FAIM in 2004. All but Ahlquist were currently inactive members. Stacey Taylor, Clayton Cates, and Melissa Wright were associated with the gang.

Tribble was asked to assume the following hypothetical facts: Phillips was involved in selling methamphetamine to Grockett, which he obtained from defendant and his brother, Sergio; Phillips arranged to meet Grockett on Crockett Boulevard off the Cummings Skyway, and during that meeting, Phillips, defendant, and defendant's cousin, Primo, killed Grockett. Tribble opined that the killing was committed in association with FAIM because Phillips was a leader of the FAIM gang and was involved in the sales of methamphetamine, which he obtained from the Vega-Robles brothers and cousin. In his opinion, "There was a noted association between those men, and the sales of the

22

methamphetamine at the time was an activity that further promoted the gang FAIM." Assuming Grockett posed a threat to a member of FAIM, killing him would benefit FAIM. Tribble testified, "You no longer have a threat that's not only physically threatening a member or more than a member of the gang but that same physical threat would entail the threat of future sales of methamphetamine which is the primary activity of the gang. So it would benefit the gang twofold."

San Pablo Detective Robert Brady testified as a gang expert on Hispanic gangs in Contra Costa County. Sureños were active in west Contra Costa County from 2000 to 2006. The Sureños gang in west Contra Costa County is broken up into small groups, and RST is a subset of the Sureño gang in that part of the county. The primary activities of the Sureños include "drug sales, violent acts, assaults, assault[s] with firearms, murders, and car theft." The primary activities of the RST were the same as those of the Sureños in 2004 and 2005. Brady opined that Delatorre was a Sureño in 2003 and 2004. He was asked to assume the following hypothetical facts: a drug dealer with ties to trafficking in Mexico, and who is running short of money, learns there is another dealer who has possession of a few pounds of methamphetamine. He makes plans with two RST members to rob that dealer, and the RST members ride in car with the dealer to rob him. Brady opined that in those circumstances the robbery or attempted robbery could benefit the gang financially.

## II. Defense Evidence.

The defense presented witnesses to impeach the testimony of Stacey Taylor and Timothy Covey. On January 13, 2010, Thomas Covey (Timothy's brother) was charged with the murders of Guzman-Mercado and Grockett and the attempted murder of Hernandez. Timothy Covey denied having any knowledge of the attempted murder to a defense investigator. The investigator met with Covey and saw no physical resemblance between him and his brother.

23

The attorney who represented Phillips in a domestic violence case recalled Stacey Taylor testified the incident was an accident; two witnesses brought to the defense by her also testified it was an accident. The attorney believed her. Phillips was acquitted.

The defense called Ralph Nash, a former member of the Nazi Low Riders, a prison gang. Nash was in prison in protective custody at the time of trial, and was called to show Phillips killed Grockett for personal reasons not related to a drug conspiracy. Nash testified Grockett was an Aryan Brotherhood gang member. Grockett told Nash he was going to kill Phillips, and that he had put a gun to Phillips's head. Nash was ordered by the Aryan Brotherhood to kill Phillips because Phillips wore a shamrock tattoo he was not authorized to have, and because Phillips failed to carry out an order to kill a snitch. Nash gave a statement to Detective Pate in October 2009 but it was not true, and he recanted to prison officials a few days later. Nash denied receiving a call from Phillips in which Phillips told Nash, "Dude, I killed him [Grockett], it's over."

Nash's October 2009 tape-recorded interview was played to the jury. In it, Nash told Detective Pate and Officer David Berna, a gang investigator at California State Prison, Corcoran, that FAIM was a "street gang banging" "clique" started around 1994 to protect White gang members from Blacks in Richmond and "sell drugs and make money." Older members wore shamrock tattoos. Nash knew Calacas, who was "real tight" with Phillips, "one of his boys." He met Sergio twice. All of them carried guns. He knew Clayton Cates through Bubba "and all them. . . . They just all together sellin'. It's, like, one big family." He knew Sally Sinclair from dropping off drugs from Phillips at her house.

Nash was a close friend of Phillips and Grockett. Phillips and Grockett were cellmates at Pelican Bay State Prison. In 2004, Phillips asked Nash to "set up" Grockett so Phillips could kill him. He wanted Nash to lure Grockett to a house in Rodeo. Nash did not want to be "dragged in no murder," so Nash twice warned Grockett that Phillips

24

was "gunnin" for him. Nash did not mention he was supposed to set Grockett up. Grockett just "shook it off." The day after Grockett's death, Phillips called Nash and said, "It's over, man. . . . I killed [Darrell]. It's done. . . . That punk's over. . . . It's over. Come over. We need to talk." Nash did not know of anybody else involved in Grockett's killing. Nash owed Phillips $8,000 for methamphetamine. Phillips was his main source. Sometimes Phillips would send Bubba to him with the drugs.

Nash said he was supposed to kill Phillips because Phillips had failed to kill witnesses against an Aryan Brotherhood member, and wore the shamrock on his face without permission.

A day or two after the interview, Nash contacted Berna and said he did not want anything more to do with Inspector Pate; he did not want to testify because he had family in Contra Costa County and that worried him. Nash did not say he lied during the interview.

The defense presented evidence to show that no physical evidence connected defendant to the robbery and murder of Guzman-Mercado. No fingerprints or DNA matching defendant or Delatorre were found at Guzman-Mercado's apartment. No blood or bullet holes were found in a four-door Lexus processed by police. However, there was a dimple in the passenger side rear door. No blood or bullet holes were found in a two-door Lexus, also processed.

Gilberto Gutierrez admitted to Detective Goldberg he removed items from Guzman-Mercado's apartment and repaired the front door of the apartment on December 4.

The defense also presented evidence that other people unconnected to defendant had motives to kill Grockett. Robert Lott was incarcerated at a federal prison at the time of trial on a federal drug indictment. He was indicted on February 6, 2008 for the murders of Grockett and Guzman-Mercado, and the attempted murder of Hernandez and

25

eventually reached a deal in this case. He testified he had never met defendant. He had his own Mexican connections for drugs.

Grockett was Lott's childhood best friend who nevertheless robbed him of money and drugs at gunpoint in 2003. He knew Grockett to be violent, and testified that Grockett committed assaults, robberies, and shootings. Grockett was also a drug seller and user who usually took his drugs forcibly from someone else. He was a member of the Aryan Brotherhood. A FAIM member called Shovelhead came to Lott's house to collect money a friend of his owed FAIM member Mattie Boy.

On October 8, 2004, deputies located a burned-out van near the location where Grockett's killing took place. The van had been stolen from one of Lott's drug customers.

According to Detective Pate, Stacey Taylor told him Phillips told her that he and Grockett were supposed to do something for the Aryan Brotherhood gang they did not do, and Phillips was worried Grockett was going to try to kill him over it. Taylor also said Phillips told her either he or Josue (Primo) shot Grockett in the head, but she "got a feeling that all three of them [Coby, Josue and defendant]" were involved in the shooting.

On February 14, 2007, Detective Goldberg interviewed defendant in Sonoma County jail. Defendant was advised of his constitutional rights and said he understood them. Defendant admitted knowing Ricardo Ruiz and Juan Antonio Delatorre and identified photographs of them. Defendant said Guzman-Mercado was "set up" by his own cousin and a drug dealer named Alejandro. Alejandro asked defendant whether he wanted to be involved and defendant declined, although defendant's cousin Primo agreed to participate.

According to defendant, Guzman-Mercado's cousin told Guzman-Mercado to come to a certain car wash with crystal methamphetamine and get in the car with Primo, Ruiz, and Delatorre. Guzman-Mercado did as instructed. Defendant said Ruiz was

26

driving, Primo was sitting in the front seat, and Delatorre was in the back seat. There was an argument in the car, a little bit of a struggle, and Delatorre shot Guzman-Mercado. Defendant said he was in a nearby Denny's restaurant when the shooting occurred. There is a Denny's at the corner of San Pablo Dam Road and Interstate 80. Defendant said he had been "working together" with Alejandro and that he did not know the name of the Guzman-Mercado's cousin who was involved.

Defendant adamantly denied being in the car when Guzman-Mercado was shot. Defendant said "he knew about this whole plot and the scam, the way it was supposed to happen and the details of it. He just said he wasn't present in the actual vehicle itself." He also said Delatorre went into the apartment and obtained methamphetamine from it.

Defendant was worried that his name would come out in Detective Goldberg's report, and Goldberg told him to get past that; it was a given that his name would be in the report. Defendant said he wanted to make a deal.

Defendant admitted he knew Coby Phillips, who was his "home-boy." He said he "served" Phillips, meaning he sold drugs to Phillips. Defendant also knew Bubba.

## DISCUSSION

I. *Sanchez* **Error Occurred, But the Errors Were Harmless Beyond Reasonable Doubt.**

In his original briefs, defendant claimed the court improperly gave a "nontruth" expert hearsay instruction pursuant to CALCRIM No. 360 that was weak, confusing, inherently ineffective, and which denied him due process, a fair trial, and the right to confront testimonial hearsay. However, he acknowledged the instruction had been approved, and his objections to it were contrary to binding authority. (See *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619, overruled in part in *Sanchez, supra*, 63 Cal.4th at p. 686; *People v. Hill* (2011) 191 Cal.App.4th 1104, 1129–1130.) Bound by existing precedent, we rejected defendant's argument. However, we noted the California Supreme Court had granted review in *People v. Sanchez* to decide whether a criminal defendant's Sixth Amendment right to confrontation is violated by a gang expert's

27

reliance on testimonial hearsay under *Crawford v. Washington* (2004) 541 U.S. 36. Following remand, we asked the parties for supplemental briefing on the effect of *Sanchez*. After careful reconsideration of the issue in light of *Sanchez*, we conclude some inadmissible hearsay was admitted, but none of it was testimonial; the instructions on expert testimony were erroneous, at least in part; and any errors were harmless beyond a reasonable doubt, given the extensive admissible testimony about gang issues from former gang members, including a defense witness, and the wives and/or girlfriends of defendant and Coby Phillips.

**The *Sanchez* Decision**

The defendant Sanchez was charged with the substantive crimes of possession of a firearm by a felon, possession of drugs while armed with a loaded firearm, active participation in the "Delhi" street gang, and a street gang enhancement allegation for committing a felony for the benefit of the Delhi gang. (*Sanchez*, *supra*, 63 Cal.4th at pp. 671, 698.) To prove he was a member of a gang, the prosecution called a Santa Ana police detective as a gang expert. (*Id.* at pp. 671–672.) The expert testified about his experience and training; the practice of issuing "STEP notices" to gather information from, and impart warnings to, the associates of known gang members; preparation of field identification (FI) cards recording police contacts with individuals; gang culture in general, and the Delhi gang (of which Sanchez allegedly was a member) in particular; the way gangs operate; and the Delhi gang's territory, membership, modus operandi, and primary activities. (*Id.* at pp. 672–673.) A jury convicted the defendant as charged. (*Id.* at p. 673.) The *Sanchez* court reversed the jury findings on the street gang enhancements, holding that "the case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law. They were recited by the expert, who presented them as true statements of fact, without the requisite independent proof. Some of those hearsay statements were also testimonial

28

and therefore should have been excluded under *Crawford.* The error was not harmless beyond a reasonable doubt." (*Id.* at pp. 670–671.)

With respect to the hearsay rule, the Supreme Court in *Sanchez* drew a distinction between "an expert's testimony regarding his general knowledge in his field of expertise," and "case-specific facts about which the expert has no independent knowledge." (*Sanchez, supra,* 63 Cal.4th at p. 676, italics omitted.) The former is not barred by the hearsay rule, even if it is "technically hearsay," while the latter is. (*Ibid.*) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried. Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts. An expert may then testify about more generalized information to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean. The expert is generally not permitted, however, to supply case-specific facts about which he has no personal knowledge." (*Ibid.*) The court gave the following example to illustrate the difference: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify. The expert could also be allowed to give an opinion that the presence of a diamond tattoo shows the person belongs to the gang." (*Id.* at p. 677.)

With respect to the confrontation clause, the *Sanchez* court reaffirmed that "[i]f a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, . . . [a]dmission of such a statement violates the right to confrontation if the statement is *testimonial hearsay,* as the high court defines that term." (*Sanchez, supra,* 63 Cal.4th at p. 680.) Synthesizing the high court's numerous opinions following

29

*Crawford*, the *Sanchez* court defined testimonial hearsay as "statements about a completed crime, made to an investigating officer by a nontestifying witness . . . unless they are made in the context of an ongoing emergency . . . or for some primary purpose other than preserving facts for use at trial." (*Sanchez*, at p. 694.)

The *Sanchez* court rejected prior courts' attempts to avoid the hearsay and confrontation problems inherent in an expert's basis testimony "by giving a limiting instruction that such testimony should not be considered for its truth. If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay exception. Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Sanchez, supra*, 63 Cal.4th at p. 684, fn. omitted.)

Applying a "two-step analysis" (*Sanchez, supra*, 63 Cal.4th at p. 680) to the facts before it, the *Sanchez* court first determined the expert's "case-specific" testimony about the defendant's contacts with and admissions to *other* police officers about his gang involvement was inadmissible hearsay because the expert had never met Sanchez, and his knowledge of Sanchez's contacts with the police was based on police records. (*Id.* at pp. 670–671, 673.) The expert's background testimony about general gang behavior or the Delhi gang's behavior or territory raised no hearsay or confrontation concerns; it was "based on well-recognized sources" in the expert's area of expertise and was "relevant and admissible evidence as to the Delhi gang's history and general operations." (*Id.* at p. 698.)

Next, the court determined the expert's testimony about the defendant's five prior police contacts was *testimonial* hearsay because it was based on police reports by other officers compiled during police investigation of completed crimes. (*Sanchez, supra*,

30

63 Cal.4th at p. 694.)  Likewise, the expert's testimony about the defendant's gang membership, gained during the issuance of a STEP notice to him by another officer, was also testimonial because that officer gathered the information from the defendant for the primary purpose of establishing facts to be later used against him or his companions at trial, and recorded it on "an official police form containing the officer's sworn attestation that he issued the notice on a given date and that it accurately reflected the attendant circumstances, including defendant's statements." (*Id.* at pp. 696–697.)  The court was unable to determine whether the information about the defendant recorded on an FI card was testimonial because the circumstances of its creation were not clarified by the parties at trial.  Nevertheless, the court concluded the expert's testimony based on the police reports and the STEP notices was prejudicial—that is, not harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. 18—because the expert's "case-specific testimony as to defendant's police contacts was relied on to prove defendant's intent to benefit the Delhi gang when committing the underlying crimes to which the gang enhancement was attached."[9]  (*Sanchez*, at p. 698.)  Accordingly, the court reversed the jury's true findings on the street gang enhancements.  (*Id.* at p. 699.)

**Application of *Sanchez***

Defendant claims not to challenge the experts' "general background information or opinions."  Yet he challenges as case-specific facts outside the experts' personal knowledge "*all* non-hypothetical assertions of *all* the named specific drug/homicide-accomplices' gang membership, leadership status, and drug involvements . . . [and] all the hypotheticals tied to this case to the extent they named specific persons;" and all, or most, of the "hearsay assertions about out of court information that supported these case-specific assertions."  We reject that contention.

---

[9] The defendant's conviction for the substantive offense of active membership in a criminal street gang (§ 186.22, subd. (a)) was reversed on other grounds by the Court of Appeal.  (*Sanchez, supra*, 63 Cal.4th at p. 673 & fn. 5.)

Detective Tribble, the expert on white supremacist gangs including FAIM, testified he gained his knowledge and expertise through hundreds of hours of formal and informal training and numerous interviews he has conducted of gang members who belonged to FAIM. Detective Brady, the expert on Hispanic gangs, also testified his knowledge and expertise were gained through more than 100 hours of formal training, his investigation of more than 100 gang cases, and over 100 interviews with gang members. In addition, since his assignment to the gang unit in 2008, Brady had been "taught . . . a lot about gangs" by his superior, Lt. Jeff Palmieri, a 27-year veteran of the police department and a recognized gang investigator in Contra Costa County. Based on this trove of knowledge, the experts testified about the gangs' history, territory, insignia, and primary activities.

To the extent defendant's scattershot approach targets the underlying sources of the officers' training, knowledge, and expertise, his aim is off the mark. The *Sanchez* court specifically exempted from scrutiny "an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) As another court has recently observed: "Under *Sanchez,* facts are only case specific when they relate '*to the particular events and participants* alleged to have been involved in the case being tried,' which in *Sanchez* were the defendant's personal contacts with police reflected in the hearsay police reports, STEP notice, and FI card. (*Sanchez, supra,* 63 Cal.4th at p. 676, italics added.) The court made clear that an expert may still rely on general 'background testimony about general gang behavior or descriptions of the . . . gang's conduct and its territory,' which is relevant to the 'gang's history and general operations.' (*Id.* at p. 698.) This plainly includes the general background testimony [the expert officer] gave about [the gang's] operations, primary activities, and pattern of criminal activities, which was unrelated to defendants or the current [crimes] and mirrored the background testimony the expert gave in *Sanchez*. It also falls in line with the *Sanchez* court's hypothetical

example that an expert may testify that a diamond tattoo is 'a symbol adopted by a given street gang' and the presence of the tattoo signifies the person belongs to the gang. (*Id.* at p. 677.) By permitting this type of background testimony, the court recognized it may technically be based on hearsay, but an expert may nonetheless rely on it and convey it to the jury in general terms. (*Id.* at p. 685.) Thus, under state law after *Sanchez*, [the expert officer] was permitted to testify to non-case-specific general background information about [the gang], its rivalry with [another gang], its primary activities, and its pattern of criminal activity, *even if it was based on hearsay sources like gang members and gang officers.*" (*People v. Meraz* (2016) 6 Cal.App.5th 1162, 1174–1175 (*Meraz*), italics added.)

**Detective Tribble**

Defendant takes specific aim at Officer Tribble's testimony that his opinions about FAIM were based on his "conversations with everybody that I have spoken to. So there is no single person that I'm relying on [for] information specifically." Asked by defense counsel to name "the 15 members and associates *that you've spoken with*" (italics added), Tribble testified: "Active members would include Coby Phillips, Troy Cariglio, Robert Donohue, Irish Donohue, Derek Hanson, Jason Dikes, Jeanna Quesenberry, and . . . Darrin Minifie . . . . [¶] The inactive members would include Thomas Covey, Tim Covey, Steve Buchanan, Scott Schweiger. [¶] And then associates would include Stacy Taylor, Clayton Cates, and Melissa Wright."[10] Defendant also singles out Tribble's testimony that inactive members of FAIM and other gang investigators told him about the history of FAIM's founding by Coby Phillips, Thomas Covey, and two others; Tribble's identification of a document prepared by the California Department of Justice in 2010 with Tribble's help, which was "created for a separate unrelated case," and which showed "numerous photos of people that I know to be members of F.A.I.M. back in 2007"; and

---

[10] Although defendant alleges Tribble testified about conversations he had with police and custodial employees, no police officers or custodial employees were referenced by Tribble in the pages cited by defendant.

Tribble's testimony that he knew from his personal knowledge that the four founders whose photographs (Phillips, Thomas Covey, and the two Donohues) were featured in the document, and others (Alquist, Schweiger, and Timothy Covey), "were members of F.A.I.M. in 2004."

Finally, defendant takes exception to Tribble's opinion that Phillips "is currently recognized and at the time was recognized as the shot caller or leader of F.A.I.M.," and "[a]s far as what I know Coby Phillips was involved in . . . that time period, [in] the sales of methamphetamine" and "[t]here was a noted association between those men [Phillips, defendant, and defendant's cousin Primo], and the sales of the methamphetamine at the time was an activity that further promoted the gang F.A.I.M."

In our view, testimony about the history and founding of FAIM was admissible under *Sanchez* as background information, even though the sources for the information were hearsay. The Attorney General concedes, and we agree, that Officer Tribble's testimony that Coby Phillips, Thomas Covey, and others were members of FAIM, that Phillips was a leader of FAIM, and that Phillips was involved in methamphetamine trafficking with defendant and his cousin Primo, were "[c]ase-specific facts . . . relating to the particular events and participants alleged to have been involved in the case being tried." However, as *Sanchez* teaches, an expert "is generally not permitted . . . to supply case-specific facts *about which he has no personal knowledge*." (*Sanchez, supra*, 63 Cal.4th at p. 676, italics added.) In this case, Officer Tribble testified he had met Phillips, seen his tattoos, seen letters signed by Phillips as "FAIM" rather than his name, had spoken with Thomas Covey at least six times, and knew from personal knowledge that the four founders of FAIM were members of FAIM in 2004. The fact that Tribble identified photographs placed on an exhibit created for another case does not add to or subtract from the admissibility of Tribble's testimony that the persons depicted in those photographs were members of FAIM.

34

As we read *Sanchez*, it is not error for a gang expert to testify about case-specific facts about which he has personal knowledge. However, testimony about case-specific facts of which he does *not* have personal knowledge is inadmissible, even if specific facts are independently proven by other evidence. (See *People v. Stamps* (2016) 3 Cal.App.5th 988, 996 ["If it is a case-specific fact and the witness has no personal knowledge of it, if no hearsay exception applies, and if the expert treats the fact as true, the expert simply may not testify about it."]; see *People v. Williams* (2016) 1 Cal.5th 1166, 1199–1200 [prosecutor's objection to defense expert's testimony was properly sustained because he relied on interviews with family members for the information].)

Tribble's testimony about the information he received from his informants did not offend the confrontation clause. Tribble did not testify to any particular statement made by any one person to him about Phillips' gang affiliation, status, or drug trafficking activities. Tribble's statements were based on his personal knowledge and he was subject to cross-examination. (See *Meraz, supra*, 6 Cal.App.5th at p. 1176.) Furthermore, the *Sanchez* court determined the expert's testimony about the defendant's prior police contacts was testimonial because it was based on *sworn* police reports by other officers (who could not be cross-examined) and who compiled the information during police investigations of completed crimes. (*Sanchez*, *supra*, 63 Cal.4th at p. 694.) Similarly, the *Sanchez* expert's testimony about the defendant's gang membership gathered from him in the course of a STEP notice was also testimonial because the officer gathered information from the defendant for the primary purpose of establishing facts to be later used against him or his companions at trial, and recorded it on "an official police form containing the officer's sworn attestation that he issued the notice on a given date and that it accurately reflected the attendant circumstances, including defendant's statements." (*Sanchez*, at pp. 696–697.) The court could not say whether the expert's testimony about the information contained on an FI card was testimonial or not because the record did not contain enough information about its creation, but the court surmised

35

that "[i]f the card was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Sanchez,* at p. 697.) Here, even if we assume the information Tribble learned from his gang informants was part of an ongoing investigation into the activities of the FAIM gang, there is no indication it was gathered as part of the investigation of completed crimes, and none of the information was sworn. As *Sanchez* makes clear, to violate *Crawford*, the out-of-court statement must be made under circumstances that entail some formality or solemnity.

Defendant also takes issue with Officer Tribble's testimony that "[a]ccording to members of the Special Services Unit and Investigative Services Unit at the California Department of Corrections, in 1998 Mr. Phillips was validated as a member of the Aryan Brotherhood [AB] as well as a member of F.A.I.M." As proof that Phillips was a member of AB and FAIM, this testimony was inadmissible hearsay. It was not based on Tribble's personal knowledge and the persons who validated Phillips were not subject to cross-examination. Despite the fact that a *Crawford* objection was interposed (and overruled) as to this testimony, the record is silent as to whether Phillips' validation as a FAIM and AB member was or was not made in the course of an ongoing investigation, or for the purpose of memorializing facts related to past criminal acts for future use at trial, or whether it was a sworn statement or otherwise attended by some level of solemnity. Therefore, we cannot determine whether the statement was testimonial or not. (See *People v. Ochoa* (2017) 7 Cal.App.5th 575, 584–585.)

In any event, the case-specific facts about Phillips' gang affiliation, his connection to defendant, and the nefarious activities to which Officer Tribble testified, and which formed the basis of the prosecutor's hypothetical question to him, were amply supported by the testimony of Ricardo Ruiz, Stacy Taylor, Clayton Cates, Timothy Covey, and Jamie Beckwith, all of whom either participated in or witnessed the drug dealing operations and had personal knowledge of the events leading up to and after the Grockett

murder committed by Phillips and defendant in this case. Even the testimony of defense witness Ralph Nash supported the view that Phillips was a member and leader of FAIM, a member of AB, and had a motive to kill Grockett. It was the testimony of these witnesses on which the prosecutor relied for proof of the case-specific facts to which Tribble testified in his expert testimony. Assuming arguendo the statement was testimonial, we are convinced beyond any reasonable doubt its admission was harmless, given the plethora of admissible evidence on Phillips's gang affiliation and leadership status.

**Detective Brady**

Defendant also takes specific aim at Detective Brady's opinion testimony that Juan Delatorre was a Sureño in 2003 and 2004. We agree this testimony was about a "[c]ase-specific fact[] . . . relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra*, 63 Cal.4th at p. 676.) In this case, Detective Brady arguably had personal knowledge of Delatorre's gang status, based on his own observations of Delatorre (i.e., his tattoos), because he had spoken to Delatorre while assisting in Delatorre's arrest for breaking into a car in a casino parking lot in 2010 or 2011. However, Brady did not testify to any statement made by Delatorre to him, and Brady's testimony about the arrest did not establish that Delatorre was a gang member during the relevant time period in 2003 and 2004.

The information that Delatorre was a Sureño gang member during the relevant time period was gleaned by Detective Brady from statements made by Delatorre in 2001 and 2003 on jail documents created for the purpose of housing him safely at the jail. "If a gang member comes in and claims to be a gang member, they're housed separately depending on what gang they belong to." Specifically, Brady reviewed a one-page classification form filled out by the jail deputies in 2001 which documented "a self-admission to classifications," and a one-page self-admission form filled out by Delatorre in 2003 "coming into jail." Defense counsel's hearsay objections to this testimony were

37

overruled. Under *Sanchez*, it appears that testimony about a nonparty's out-of-court admission that he or she is a gang member, offered to prove he or she *is* a gang member, is hearsay. (*People v. Ochoa, supra*, 7 Cal.App.5th at p. 584.) However, no *Crawford* objection was interposed as to the classification forms on which Delatorre made his admissions, and the record does not contain sufficient information from which we can determine whether the classification documents in which Delatorre's admissions were recorded rendered his admissions testimonial or not. Brady had no personal knowledge of those admissions, because Delatorre did not make them to him. The record suggests the purpose of memorializing the admissions was to secure safe jail housing for Delatorre, not to investigate a completed crime. The record is silent as to whether Delatorre swore to the truth of his admission on one of the classification forms, or whether his jailers swore to the accuracy of Delatorre's statement on the other.

Brady also testified he formed this opinion after speaking with Lt. Palmieri and reading Palmieri's opinion testimony given at a previous trial. While the greater expertise of a superior would seem to qualify as a reliable source of general background information, "[a]fter *Sanchez*, reliability is no longer the sole touchstone of admissibility where expert testimony to hearsay is at issue." (*People v. Stamps, supra,* 3 Cal.App.5th at p. 996.) As discussed above, "[i]f it is a case-specific fact and the witness has no personal knowledge of it, if no hearsay exception applies, and if the expert treats the fact as true, the expert simply may not testify about it." (*Ibid*.)[11]

Assuming it was error to permit Detective Brady to testify about the hearsay bases of his opinion that Delatorre was a Sureño, as with Tribble's testimony about Phillips's gang affiliation, the prosecutor here did not rely exclusively on Tribble's expert testimony for proof of Delatorre's gang affiliation. Instead, proof of Delatorre's gang

---

[11] Defendant also takes aim at Brady's testimony, based on information from gang members, gang officers, and personal observation while working in San Pablo between 2005 and 2006, that Sureños were active in the area between 2000 and 2006. This was admissible background information having no *Sanchez* or *Crawford* implications.

affiliation rested on Ricardo Ruiz's extensive testimony about his personal knowledge of Delatorre's involvement in RST, a Sureño-affiliated gang, and Delatorre's involvement in the murder of Marcelino Guzman-Mercado, for which Delatorre was charged and tried. These otherwise proven facts also formed the basis of the prosecutor's hypothetical question. In our view, what the prosecutor did here is, by and large, exactly what *Sanchez* proposes prosecutors should do. Thus, if a *Sanchez* or *Crawford* error occurred, any error was harmless beyond a reasonable doubt, given Ruiz's testimony.

**The Instructions**

In light of *Sanchez*, the instructions given in this case were erroneous, at least in part. As in *Sanchez*, the jury was given CALCRIM No. 332 [Expert Witness Testimony], which told the jury to "consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. *You must decide whether information on which the expert relied was true and accurate.*" (Italics added.) To the extent this instruction required the jury to evaluate the expert's testimony, unmoored from the admissible evidence that supported the experts' opinion, it runs afoul of *Sanchez*.

The instruction also explained: "An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. *It is up to you to decide whether an assumed fact has been proved.* If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion." In this case, this part of the instruction was not error, because it focused the jury's attention on evaluation of all the evidence introduced to prove the hypothetical facts, not merely the hearsay underlying the expert's opinion.

The jury was also given CALCRIM 360 [Statement to an Expert], which informed the jury: "Detective Brady testified that in reaching his conclusions as an expert witness, he considered statements made by Juan Delatorre, Lieutenant Jeff Palmieri of the San

39

Pablo Police Department and statements made in Contra Costa County jail classification documents. *You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true.* Detective Tribble testified that in reaching his conclusions as an expert witness he considered statements made by Coby Phillips, Troy Cariglio, Robert Donohue, Irish Donohue, Derek Hanson, Jason Dikes, Jeanna Quesenberry, Daren Minifie, Thomas Covey, Tim Covey, Steve Buchanan, Scott Schweiger, Stacy Taylor, Clayton Cates, [Melissa] Wright and individuals employed with the California Department of Corrections and Rehabilitation Special Services and Investigative Service Units. *You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true.*" (Italics added.) As the *Sanchez* court explained in disapproving such contradictory instructions: "Jurors cannot logically follow these conflicting instructions. They cannot decide whether the information relied on by the expert 'was true and accurate' without considering whether the specific evidence identified by the instruction, and upon which the expert based his opinion, was also true. 'To admit basis testimony for the nonhearsay purpose of jury evaluation of the experts is . . . to ignore the reality that jury evaluation of the expert requires a direct assessment of the truth of the expert's basis.' " (*Sanchez, supra,* 63 Cal.4th at p. 684.)

To the extent this instruction referred to persons who did not testify from personal knowledge, it was erroneous. However, given the extensive testimony by former gang members and associates of Phillips, Delatorre, and defendant, there is no reasonable probability of a different result in the absence of the instructional error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) Indeed, in our view, the errors in this case were harmless beyond any reasonable doubt as to every finding and verdict returned by the jury. (*Chapman v. California, supra,* 386 U.S. at p. 24.)

## II. Murder Liability Instructions Premised on Natural and Probable Consequences Were Erroneous.

While defendant's appeal was pending in this court, the California Supreme Court decided *Chiu, supra*, 59 Cal.4th 155, concluding "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Chiu,* at pp. 158–159.) Judicial decisions are generally fully retroactive. (*People v. Carter* (2005) 36 Cal.4th 1114, 1144.)

In a supplemental brief, defendant argues that, because his jury was instructed under the natural and probable consequences doctrine that he could be convicted of first degree murder, his first degree murder convictions must be reversed for *Chiu* error. The Attorney General concedes error as to both murders, and further concedes the error was prejudicial as to the Grockett murder. The Attorney General contends, however, the error was harmless as to the Guzman-Mercado murder, citing the felony-murder instructions and defendant's conviction for attempted robbery. In light of *Chiu,* we agree the instruction was erroneously given. "When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground." (*Chiu, supra,* 59 Cal.4th at p. 167.)

With respect to the Grockett murder, whether defendant was a direct perpetrator of first degree murder, or a direct aider and abettor of first degree murder committed by Phillips, or whether the murder was "a natural and probable consequence of the common plan or design of the conspiracy" that "further[ed] the common plan" under CALCRIM No. 417, or a natural and probable consequence of aiding and abetting a conspiracy to sell drugs (the "target offense") under CALCRIM No. 402, were factual questions for the jury to decide. (*Chiu, supra*, 59 Cal.4th at p. 162.) The prosecutor argued all of these theories, and tended to conflate the natural and probable consequences prongs of conspiracy liability and aider and abetting liability under the general umbrella of

41

forseeability. In addition, natural and probable consequences were prominently displayed in the slide show he used during closing argument. Finally, the jury asked for a rereading of Jamie Beckwith's testimony, which bore in part on the meeting between defendant, Phillips, and Primo at The Dead Fish Restaurant just prior to Grockett's murder. Under these circumstances, we cannot conclude beyond a reasonable doubt the jury based its verdict on one of the legally valid theories before it—that defendant was either the direct perpetrator, or directly aided and abetted the premeditated murder of Grockett by Phillips—rather than on the invalid theory that first degree murder was a natural and probable consequences of conspiracy to sell drugs. Therefore, we agree with the Attorney General that defendant's first degree murder conviction for the Grockett murder must be reversed.

We also agree the error was harmless with respect to the first degree murder verdict in the Guzman-Mercado matter. In addition to instructions on conspiracy, direct aiding and abetting, and natural and probable consequence liability for murder, the court gave complete instructions on felony murder,[12] attempt,[13] and robbery.[14] With respect to count 3 (the Guzman-Mercado killing), the jury was also instructed on criminal liability for attempted robbery premised on an uncharged conspiracy to commit robbery.[15] The jury *did* find defendant guilty of attempted robbery. The general verdict does not reveal which of the several theories of liability presented to the jury actually undergirds the attempted robbery or murder verdicts. Nor was the jury required to unanimously agree on the theory of liability. (*People v. Smith* (2014) 60 Cal.4th 603, 618 (*Smith*).) However, once the jury decided defendant was guilty of attempted robbery, under the felony murder instructions given here, the Guzman-Mercado killing was first degree

---

[12] See CALCRIM No. 540B.

[13] See CALCRIM No. 460.

[14] See CALCRIM No. 1600.

[15] See CALCRIM No. 416.

murder, unless "a logical connection between the cause of death and the robbery or attempted robbery" was missing. Under the facts of this case, there is no basis to so conclude because there was a logical connection: Guzman-Mercado was targeted for robbery because he was known to possess a large quantity of methamphetamine, and he was killed—whether intentionally, accidentally or negligently—in the process of separating him from his property. There is also no basis in the appellate record to conclude the jury misunderstood, ignored, or refused to apply the felony murder instructions. Under these circumstances, we conclude beyond a reasonable doubt the erroneous instructions on natural and probable consequence liability for murder played no role in the verdict. Therefore, reversal of defendant's first degree murder conviction for the killing of Guzman-Mercado is not required.

## III. Substantial Evidence Supports the Conspiracy Conviction.

Defendant argues the evidence adduced at trial is insufficient to support his conspiracy conviction, since the evidence showed multiple conspiracies rather than a single one. " 'To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt.' " (*Smith*, *supra*, 60 Cal.4th at p. 617.) Following *Jackson v. Virginia* (1979) 443 U.S. 307, 319, we assess the verdict on appeal based on the sufficiency of the evidence. "The evidence need not be such that it excludes every hypothesis but that of a single conspiracy. . . ; rather, it is enough that the evidence adequately supports a finding that a single conspiracy exists. . . . [T]his Court would have to be able to say that *no* rational trier of fact could have found a single conspiracy on this evidence before we could disturb the jury's finding, implicit in its guilty verdict, that a single conspiracy had been proved." (*United States v. Kenny* (9th Cir. 1981) 645 F.2d 1323, 1335 (*Kenny*).) As we

discuss below, the record contains ample evidence to support defendant's conspiracy conviction.

Although defendant was tried alone, the indictment jointly charged defendant, Sergio Vega-Robles (his brother), Juan Delatorre, Josue Lemeli (Primo, his cousin) and Alejandro Figueroa with conspiracy, alleging defendant conspired with Sergio, Primo, Delatorre, Alejandro Figueroa, Coby Phillips, Thomas Covey, Robert Lott, and Tara Sander to sell narcotic and non-narcotic controlled substances. (Health & Saf. Code, §§ 11352, 11378.) Nineteen overt acts in furtherance of the conspiracy were alleged: overt act Nos. 1 and 2 involved sales of methamphetamine to Lott and Sander, respectively; the remaining overt acts involved the killings of Darrell Grockett and Marcelino Guzman-Mercado, both drug dealers, and the attempted murder of Jose Hernandez, a suspected police informant. Ricardo Ruiz was named as a coconspirator in three overt acts. [16]

A conspiracy is an agreement by two or more persons to commit any crime. (§ 182, subd. (a)(1).) "A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.) The prosecution need not prove that each conspirator knew the identity of all the other members of the conspiracy, or their exact functions. (*Blumenthal v. United States* (1947) 332 U.S. 539, 557 (*Blumenthal*); *People v. Van Eyk* (1961) 56 Cal.2d 471, 479.) If the

_____

[16] The jury was instructed that if the crimes of conspiracy, murder, attempted robbery burglary, grand theft or lesser included offenses were committed, then Delatorre, Lomeli, Lott, Phillips, Ruiz, and Sergio Vega-Robles were accomplices to those crimes. They were also instructed to decide whether Jamie Beckwith, Clayton Cates, Timothy Covey, Alejandro Figueroa, Ralph Nash, Sally Sinclair, and Stacey Taylor were accomplices.

defendant conspired with only one person instead of many, as charged, he is still guilty of conspiracy. (*People v. Collins* (1966) 242 Cal.App.2d 626, 633–634.)

The evidence supports defendant's conspiracy conviction based on an ongoing conspiracy to sell drugs. The People's case presented substantial evidence defendant was involved in a vertical chain operation that distributed illegal drugs to complicit distributors in west Contra Costa County. Jamie Beckwith, defendant's girlfriend from 2003 to 2007, testified defendant made his living as a drug dealer; he told her he obtained the drug he mainly sold, crystal methamphetamine, from Mexico. Ricardo Ruiz, who worked for defendant and Sergio Vega-Robles in the drug trade, corroborated that defendant's product came from Mexico. Defendant dealt in quantities of drugs as large as 30 pounds and handled as much cash as $400,000. He worked in tandem with Sergio but, according to Beckwith, defendant was "more of the leader." Ruiz placed defendant "higher on the food chain than a street dealer."

Several members of the conspiracy testified that Coby Philips, a close friend and business associate of defendant, and a cofounder and member of the FAIM gang, bought methamphetamine from defendant and Sergio, sometimes in quantities as large as 10 pounds. Philips resold "sales quantities" (as opposed to "street level quantities") to other FAIM members. When Phillips was incarcerated, Timothy Covey took over Phillips's business operation and started getting drugs directly from defendant. Defendant would "front" Covey a pound or two of methamphetamine, which Covey would resell to "mostly sellers" and then pay defendant back from the sales proceeds.

Ruiz, Ruiz's childhood friend Delatorre (both Sureño-affiliated gang members), Clayton Cates (Phillips's brother-in-law), Timothy Covey (Thomas "Bubba" Covey's brother), and Primo did pick-ups and deliveries of drugs for the distribution chain. Cates drove to Los Angeles on several occasions to pick up the product and bring it to the Bay Area. He got drugs from Phillips and delivered drugs to FAIM member Stephen Buchanan. Ruiz knew Phillips because he and Phillips's family members were

45

neighbors. He also went with defendant and Sergio a few times to drop off drugs at Phillips's house in Vallejo, and he personally negotiated a sale from Sergio to Phillips on another occasion.

There was circumstantial evidence to support factual findings, as alleged in the overt acts, that defendant also enlisted the aid of coconspirators lower on the distribution chain to provide backup support, or more, when defendant needed assistance to repel or rob competitors and silence informers. Phillips's wife and defendant's girlfriend both testified to a rendezvous between Phillips, defendant, and Primo at The Dead Fish Restaurant prior to the killing of Darrell Grockett, a troublesome drug dealer who threatened Phillips with bodily harm and bought drugs from Phillips but did not want to pay what Phillips charged. Before leaving for the restaurant, Phillips told his wife he was going to meet with Grockett to shoot him. Grockett's business partner in the drug trade, Sally Sinclair, confirmed that Grockett received a phone call at 8:00 p.m., and immediately thereafter left for a meeting on the night he was found dead. After the killing, Primo told Ruiz about it, and Covey overheard defendant and Primo joking about it in Spanish.

In December 2004, defendant told Phillips's wife Stacey Taylor, his girlfriend Jamie Beckwith, and Timothy Covey he knew someone he could rob of drugs or money. Later, Primo and Delatorre picked up Ruiz and Rodolfo Figueroa and drove to a rendezvous with defendant and another unidentified person. Primo talked that evening about "jacking" (i.e., robbing) someone. Primo told Ruiz to drive to a place where they were to pick up a package from a drug dealer. According to Ruiz, Delatorre shot Guzman-Mercado in the car. The next day, defendant told Ruiz, "Good job. Don't worry. You'll be fine." A week later, Delatorre told Ruiz it "wasn't supposed to happen like that. They were just going to tie him up." Afterwards, Delatorre and others went to Guzman-Mercado's apartment and got "pounds of crystal meth." Delatorre said defendant kept the drugs. Later, defendant admitted to Phillips's wife he got the money

46

or drugs and had shot someone in a car. He also admitted the shooting to Tim Covey. And defendant's girlfriend overheard a conversation between defendant, Primo, and Ruiz about pushing someone out of a car. According to Jamie Beckwith, defendant asked, "Did you finish it or did you do it?" Primo said they shot the person but he was not dead, and so they had to push him out of the car.

On February 21, 2005, the day Jose Hernandez was shot, defendant, Tim Covey, and Cates left from Phillips's wife's house; she saw them drive off together. Covey drove to a residential street in Richmond, where defendant alighted from the car and returned 45 seconds later holding a gun. Ruiz and Alejandro Figueroa, who lived next door to Hernandez, saw defendant go to the house next door to Figueroa's. Hernandez identified defendant as the person who shot him.

Weeks before the shooting, Sergio told Ruiz that Hernandez was "snitching." Sometime before the shooting, defendant told Phillips's wife that Sergio had "found out who was telling." After the shooting, defendant told Cates he shot "the guy that snitched on him." He also told Phillips's wife "he had shot the rat."

Based on the analogy made famous in *Kotteakos v. United States* (1946) 328 U.S. 750 (*Kotteakos*), defendant argues the evidence summarized above shows at most that defendant was the "hub in a wheel selling in larger quantities to the spokes," without evidence of "a rim connecting these spokes as might show a single ongoing plan or conspiracy." "The nature of that 'rim' defies precise statement, but general principles are well established. . . . 'The government need not show direct contact or explicit agreement between the defendants. It is sufficient to show that each defendant knew or had reason to know of the scope of the conspiracy and that each defendant had reason to believe that their own benefits were dependent upon the success of the entire venture.' [Citation.] Once the existence of a conspiracy has been established, evidence of only a slight connection is necessary to convict a defendant of knowing participation in it." (*United States v. Kenny, supra*, 645 F.2d at p. 1335.)

47

Where there is a variance between an indictment charging one conspiracy and proof at trial of multiple conspiracies, reversal is required only if the variance prejudicially affects the defendant's substantial rights. (*Kenny, supra*, 645 F. 2d at p. 1334; *United States v. Castaneda* (9th Cir. 1994) 16 F.3d 1504, 1509; *Berger v. United States* (1935) 295 U.S. 78; *Kotteakos, supra*, 328 U.S. at p. 757.) "[T]he review of such a case involves two inquiries: was there a variance, and if so, was it prejudicial." (*Kenny*, at p. 1334.)

In this case we find no variance. "This [wheel] arrangement is a single conspiracy only when the activities of each of the spokes is interrelated, as when the success of each of the activities depends on the success of the others." (*United States v. Stroupe* (4th Cir. 1976) 538 F.2d 1063, 1066.) In *Kotteakos, supra*, 328 U.S. 750, one person arranged fraudulent loans with numerous borrowers. (*Id*. at pp. 752–754.) "[E]ach separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan." (*Blumenthal*, *supra*, 332 U.S. at p. 558.)

In our view, the conspiracy here is more like the illegal liquor distribution scheme to sell illegally priced whiskey to tavern owners through seemingly legitimate means in *Blumenthal, supra,* 332 U.S. at p. 553, than it is like the fraudulent loan scheme in *Kotteakos*, *supra*, 328 U.S. 750. In *Blumenthal,* the evidence showed two agreements, one between X, the unknown owner of the whiskey, and the two defendants at the top of the distribution chain; and a second agreement to which X was not a party, between the

48

top-end distributors and the other conspirators who carried out the actual sales. (*Blumenthal*, at p. 556.) In upholding the defendants' single conspiracy convictions against variance and insufficiency of the evidence challenges, the *Blumenthal* court viewed the two agreements as steps or stages in the formation of a larger, more general, all-inclusive conspiracy directed to achieving a single unlawful end or result. (*Id*. at p. 558; see also *People v. Elliott* (1978) 77 Cal.App.3d 673, 684–685.)

In our view, the evidence here showing a vertically integrated distribution scheme to get Mexican methamphetamine to end-users in west Contra Costa County was more than sufficient to establish an overarching conspiracy to sell illegal drugs for profit, as charged. Here, the evidence showed defendant obtained the methamphetamine—from Mexico or from less savvy drug dealers—and distributed it to others—Primo, Phillips, Covey, Ruiz, and Delatorre—who performed their parts in making sure defendant's product was delivered to various levels of middlemen between defendant and the end-users. Sometimes their duties involved pickups and deliveries, and sometimes they involved shooting people who got in the way of the operation, but all contributed in one way or another to the success of the criminal enterprise. It was not *also* necessary for the prosecution to prove drug sales to Robert Lott, as defendant suggests. Evidence that defendant also sometimes dealt in small quantities, or that Phillips also bought product from others, or that Ruiz and Delatorre were also drug users, does not undermine the basic premise that defendant was a large scale supplier of methamphetamine to others in west Contra Costa County who knowingly sold drugs to middle- and lower-level dealers in the distribution chain, so that everybody in the chain could make some money from the drug sales. "When all inferences favorable to the prosecution are drawn, the evidence discloses the existence of a narcotics ring whose ultimate objective, shared in by a number of people performing various functions, was to bring narcotics into the possession of addicts for profit. . . . [¶] It has been held that persons can be prosecuted as conspirators if, by buying, selling, or doing some other act, they knowingly

49

participated in a general plan to place narcotics in the hands of ultimate users." (*People v. Van Eyk*, *supra*, 56 Cal.2d at pp. 478–479.) Such is the case here. No variance between the indictment and the evidence adduced at trial appears, and substantial evidence supports defendant's conspiracy conviction.

## IV. Substantial Evidence Supports the Gang Enhancement Findings.

Defendant also contends the evidence was insufficient to support the gang enhancements alleged under section 186.22, subdivision (b)(1), given that neither defendant, Grockett nor Guzman-Mercado were members of FAIM or RST. He argues it is "simply speculative" to infer Phillips or Primo shot Grockett, and Delatorre shot Guzman-Mercado, in association with or for the benefit of a gang, or to further conduct by gang members. We disagree.

Section 186.22, subdivision (b)(1), provides in relevant part: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, *or in association with any criminal street gang*, with the *specific intent to promote, further, or assist in any criminal conduct by gang members*, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows. . . ." (Italics added.) " '[S]pecific intent to *benefit* the gang is not required. What is required is the "specific intent to promote, further, or assist in any criminal conduct by gang members. . . ." ' " (*People v. Leon* (2008) 161 Cal.App.4th 149, 162.)

Phillips and Thomas Covey were cofounders of the FAIM gang, whose primary activity was drug dealing, according to Phillips's wife Stacey and Thomas Covey's brother Timothy. According to Timothy Covey, the gang was formed to provide "muscle" to "help our drug trade." Tim Covey took over the reins of Phillips's drug trade after Phillips was incarcerated. Defendant would "front" Covey a pound or two of methamphetamine, which Covey would then resell mainly to sellers, and pay defendant out of the sale proceeds. Gang expert Detective Tribble also opined that FAIM was a

50

criminal street gang whose primary activity was selling large quantities of methamphetamine.

Although Covey was not directly involved in Grockett's murder, Covey testified he later overheard defendant and Primo joking about it. Covey testified that, when defendant and Phillips returned after the Grockett killing, "everybody was pretty much let known that we needed to start carrying guns and we were all hanging around Coby's house in Vallejo." Other evidence established that Grockett was one of the drug dealers to whom Phillips's organization resold the drugs, that he did not want to pay Phillips's price for the drugs, and that Grockett had threatened Phillips's life. Tribble opined that if Grockett was interfering with the FAIM gang's drug sales, or threatening Phillips's life, killing Grockett would financially benefit the gang. Tribble testified, "You no longer have a threat that's not only physically threatening a member or more than a member of the gang but that same physical threat would entail the threat to future sales of methamphetamine which is the primary activity of the gang."

Ruiz testified he and Delatorre were members of RST, a Sureños gang. According to Ruiz, one of the primary activities of the RST gang was selling methamphetamine and marijuana. Gang expert Detective Brady concurred that Delatorre was a Sureño gang member in 2003 and 2004, and that one of the primary activities of RST from 2000 to 2006 was selling drugs. Ruiz and Delatorre were part of defendant's distribution ring and both participated in the robbery and murder of Guzman-Mercado. Brady opined that robbery or attempted robbery could benefit the gang financially.

The prosecutor conceded defendant was not a gang member. But under the circumstances presented here, an inescapable inference was that FAIM's and RST's drug trades benefitted from activities that advanced defendant's enterprise, and vice versa: defendant used the gang infrastructure already in place to facilitate the sales; what was good for him was also good for the gang. Thus, a reasonable trier of fact could find from the facts presented that defendant orchestrated the robbery of Guzman-Mercado,

51

and participated in the murder of Grockett, in association with members of RST and FAIM, with the specific intent to promote, further, or assist in the gangs' primary criminal activity—selling methamphetamine. In short, substantial evidence supports the conclusion that defendant acted in concert with members of the RST and FAIM criminal street gangs with the requisite intent by using gang members to pick up and deliver drugs, collect monies and, on occasion, rob and kill other drug dealers, and by distributing his drugs through the gang networks already in place.

## V.    Defendant's Invocation of Counsel Was Equivocal.

Prior to trial, defendant moved to exclude defendant's statement to police on the ground all questioning should have stopped as soon as he asked for an attorney.[17] Defendant argues he "unequivocally invoked the right to counsel; *in light of his requests for counsel*, the implied waivers are not shown to be knowing, intelligent, or voluntary either." (Italics added.)

The transcript of defendant's interview shows the interview began with defendant being asked if he spoke English. He responded: "A little bit." Next he was asked for his name, which defendant gave as Raúl Sánchez Contreras. Detective Goldberg introduced himself and his partner, and asked if defendant understood his rights. Defendant indicated he needed an interpreter and was informed the other deputy could interpret for him. In English and Spanish, defendant was asked if he understood his constitutional rights, including his "right to have an attorney and . . . the right to have that attorney here with you before and during any questioning." Defendant said, "Yes" ("Sí"). In English, defendant was then asked: "Okay. Alright. Now . . . ah . . . I think you understand English enough to understand what I'm saying to you, okay?" Defendant responded in English: "I understand a little bit." He was asked, "Do you go by any other names?" Defendant said, "No." After a little more jockeying about his name, defendant was told

---

[17] An additional ground, that defendant's statement was involuntary due to implied promises to let him go, is not raised on appeal.

in Spanish, "Okay, he's not interested to why you were arrested today. [¶] . . . [¶] He's interested about another case that he imagines that you know that . . . about the case he's talking about." Defendant responded in Spanish, "Like what?" The detective answered, in English, "[W]e can start with . . . What is, what his real name is." Defendant admitted the detectives knew his real name; they also showed him a picture and he acknowledged it was a picture of himself. He also admitted he was known as Calacas. Then the detective said in English, "[W]e're both doing an investigation, uh, it's for an older case and . . . you understand English now?" Defendant said, "Yeah, I understand English but . . . ." Detective Goldberg responded, "Okay. Tell, tell me if you need him to explain what I'm saying to you," to which defendant responded: "Okay."

Detective Goldberg then informed defendant his name came up in an investigation, but "just because someone tells us you were there, okay, doesn't necessarily mean I believe what everybody tells me. . . ." Switching to Spanish, defendant said he did understand, more or less, that people say things. The Spanish speaking officer then translated: "[W]hen he was doing an investigation in a case, your name [¶] . . . [¶] came out and . . . and since he respects you in the way you deserve, . . . he wants to know your side of the story. He doesn't just want the side that they told him. You understand?" In Spanish, defendant responded, "I want you to ask him what, what, what they know, what . . . I don't know." The Spanish-speaking officer continued, "That's why, that's what he's getting at. But he's just saying to know your side of the story that . . . that's why he's going to ask you the questions . . . about the case. But he's just letting you know that . . . your name came up during the investigation [¶]. . . [¶] and that's why he's coming to talk with you so that . . . to hear your side of the story. [¶] . . . [¶] Okay?"

Defendant responded, "Uh, but . . . okay, that's fine. Uh, I want to listen but, . . . *can I also . . . couldn't I talk to an attorney?*" The Spanish-speaking officer responded: "What was that?" ("¿Que qué?") Defendant said, in Spanish, "Uh, I can listen but ah . . .

53

what is . . . what is it that . . . you can tell me what, what, what happened?" The interview continued without defendant ever again mentioning an attorney.

The trial court ruled the statement admissible on alternative grounds. First, "there was enough background noise that the detective needed to clarify what was said and so for that reason I find there was no clear invocation." Second, "even if . . . Detective Santiago did hear 'couldn't I talk to an attorney,' that is a question and not a clear invocation and the translator, Detective Santiago, did respond with, 'What was that?'"

A request for counsel must be unequivocal before police interrogation must cease. (*Davis v. United States* (1994) 512 U.S. 452, 456, 459 (*Davis*).) It cannot be ambiguous or equivocal; otherwise "the *Miranda* safeguards [become] wholly irrational obstacles to legitimate police investigative activity." (*Id.* at p. 460.) "Consistent with *Davis,* a reviewing court . . . must ask whether, in light of the circumstances, a reasonable officer would have understood a defendant's reference to an attorney to be an unequivocal and unambiguous request for counsel, without regard to the defendant's subjective ability or capacity to articulate his or her desire for counsel, and with no further requirement imposed upon the officers to ask clarifying questions of the defendant. (*Davis, supra,* 512 U.S. at pp. 460–462.) In reviewing the issue, moreover, the reviewing court must 'accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. [The reviewing court] independently determine[s] from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " (*People v. Gonzalez* (2005) 34 Cal.4th 1111, 1125.)

Applying this standard to the facts before us, we conclude defendant's invocation did not require the police to cease questioning him. Defendant does not argue the trial court was wrong in its view that at the critical point background noise so occluded defendant's response that Officer Santiago had to ask defendant what he said, and we see no reason in the record to second-guess the trial court on that point. More importantly,

we agree with the trial court that a question is not an unequivocal invocation precluding the police translator from even asking, "¿Que qué?" ("What was that?") However, given the opportunity to rephrase his question or restate it as a request for counsel, defendant did neither. We find no error. Since there was no unequivocal invocation of counsel, there is no basis on this record to question the voluntariness of defendant's implied waivers of his constitutional rights.

Defendant makes an ancillary argument that the trial court committed prejudicial error by failing to strike the initial question and answer about whether defendant asked if he could make a deal. In the first place, defense counsel did not object to that exchange but to the follow-up question and answer about whether defendant was in a position to make a deal. The court did sustain that objection and order the question and answer stricken. Moreover, the court did not abuse its discretion in concluding that, in the context of a police interrogation (not a plea bargain), defendant's statement was evidence of consciousness of guilt. No error and no prejudice appear.

## VI.    There Was No Double Jeopardy Violation.

Defendant claims reversal of the entire judgment is required because the court erroneously denied his motion to dismiss the conspiracy count on state and federal double jeopardy grounds. We disagree.

In May 2009, the Oakland Branch of the United States Attorney's Office for the Northern District of California filed a superseding information charging defendant with knowingly and intentionally using a communication facility (a telephone), on November 22, 2005, to facilitate the commission of a drug trafficking felony in violation of Title 21 United States Code section 841(a)(1). (21 U.S.C § 843(b).) On May 11, 2009, defendant pleaded guilty "to Count One of the captioned superseding information charging [him] with knowingly and intentionally using a communication facility (a telephone) to facilitate the distribution of a mixture or substance containing a detectable amount of *cocaine*, in violation of Title 21, United States Code, Section 843(b)." (Italics

55

added.)  In the plea agreement, defendant acknowledged the elements of the offense were identical to the allegation set forth above.[18]

The trial court found no violation of double jeopardy, because the federal charge to which defendant pleaded guilty was not based on the same act or acts as the conspiracy to sell methamphetamine in Contra Costa County. The trial court was correct.  The double jeopardy clause of the Fifth Amendment to the United States Constitution does not preclude multiple convictions in different sovereign jurisdictions for the same criminal act.  (*Heath v. Alabama* (1985) 474 U.S. 82, 93.)  Thus, even if the act of using the telephone to negotiate a drug debt for one kilo of cocaine on November 22, 2005, had been charged in California as a violation of California law, the California prosecution would not have violated federal constitutional law.

However, California provides greater double jeopardy protection by statute than that afforded by the federal Constitution.  (*People v. Comingore* (1977) 20 Cal.3d 142, 145; §§ 656, 793.)[19]  The trial court rejected defendant's state double jeopardy claim because "a conviction in this state is not barred where the offense committed is not the same act that involves an element not present in the prior prosecution.  [¶]  I do not read *People v. Belcher* [(1974) 11 Cal.3d 91] as only . . . raising the argument that California courts use a transactional approach [to] a prior jeopardy.  In fact, in *Belcher* the courts

_____

[18] As a factual basis, defendant admitted that on November 22, 2005, he spoke to his father on the telephone "about some drug debts that we were owed. In particular, on that day, I negotiated a drug debt with a person who owed payment for one kilogram of cocaine."

[19] Section 656 provides:  "Whenever on the trial of an accused person it appears that upon a criminal prosecution under the laws of the United States, or of another state or territory of the United States based upon the act or omission in respect to which he or she is on trial, he or she has been acquitted or convicted, it is a sufficient defense."

Section 793 provides:  "When an act charged as a public offense is within the jurisdiction of the United States, or of another state or territory of the United States, as well as of this state, a conviction or acquittal thereof in that other jurisdiction is a bar to the prosecution or indictment in this state."

made it clear that they rejected a course of the conduct rule and have adhered to a strict *same acts* rule. I think that what occurred in all of the materials that I reviewed was that there was a conflating of investigation and complaints with acquittal or conviction. And despite the fact if there had been some overlap, even if there had been an entire overlap between the state and the federal investigation, there was not an acquittal nor a conviction of conspiracy in this case."

Under sections 656 and 793, " 'a defendant may not be convicted after a prior acquittal or conviction in another jurisdiction if all the acts constituting the offense in this state were necessary to prove the offense in the prior prosecution [citation]; however, *a conviction in this state is not barred where the offense committed is not the same act but involves an element not present in the prior prosecution.*' " (*People v. Comingore, supra*, 20 Cal.3d 142, 146; *People v. Candelaria* (1956) 139 Cal.App.2d 432, 440; *People v. Belcher, supra*, 11 Cal.3d at p. 99; *People v. Bellacosa* (2007) 147 Cal.App.4th 868, 873-878.)

To illustrate, in *People v. Belcher, supra*, 11 Cal.4th 91, a federal narcotics agent and an undercover Oakland police officer were robbed at gunpoint by the defendant. In federal court, Belcher was acquitted of assault on a federal officer, but he was subsequently convicted in state court of assault with a deadly weapon and two counts of robbery. (*Id*. at pp. 94–95.) The California Supreme Court reversed the assault conviction because it was based on the same act—"the same assault upon the same person," at issue in the federal case. (*Id*. at pp. 99–100.) The robbery convictions were affirmed because they involved additional acts, the taking of personal property, not necessary for proof of the federal assault charge. (*Id*. at pp. 100–101.) In doing so, the court reaffirmed that section 654's "course of conduct" rule does not apply under section 656 (*Belcher*, at p. 98). While a defendant may not be convicted in this state after a prior acquittal or conviction in another jurisdiction "if all the acts constituting the offense in this state were necessary to prove the offense in the prior prosecution," he

may be convicted where the offense "is not the same act [because it] involves an element not present in the prior prosecution." (*Id*. at p. 99.)

Recently, our Supreme Court developed the limits of section 656 and its double jeopardy protection in *People v. Homick* (2012) 55 Cal.4th 816. Homick was convicted of conspiracy to commit murder and two counts of first degree murder with special circumstances (murder for financial gain and lying in wait were alleged as the special circumstances). His death sentence was affirmed. Homick was previously acquitted in federal court of a charge of murder for hire (a violation of 18 U.S.C. former § 1952A, which has since been renumbered to § 1958) involving the same victims in the state prosecution. (*Id*. at p. 837.) Our high court held the application of section 656 "turns on whether the California charges against defendant required proof of conduct that was not required for conviction on the earlier federal charges." (*Id.* at p. 843.) As to the lying in wait allegation, the court concluded section 656 did not bar the state prosecution. Simply stated, the elements for lying in wait are not required as elements and proof to convict in the crime proscribed by title 18 United States Code former section 1952A, Homick's federal offense.

Here, even if defendant admitted as part of his federal plea agreement that he used the telephone frequently to negotiate drug transactions, and to discuss drug trafficking with his associates, those facts do not establish the federal and state offenses were the same charge. The federal and state convictions here did not share any of the same elements or acts. The state conspiracy charge here required proof of an agreement, which was not required to prove a violation of title 21 United States Code section 843(b). The telephone call, which was the basis of the charge in federal court, occurred eight months after all of the overt acts charged in state court under the conspiracy count. "If . . . the offenses require proof of different physical acts, then the California prosecution is not barred even though some of the elements of the offenses may overlap." (*People v.*

*Bellacosa*, *supra*, 147 Cal.App.4th at p. 874.)  Accordingly, defendant's state double jeopardy claim is not well taken.

Finally, the trial court did not err in rejecting defendant's request for an evidentiary hearing on the theory the "federal authorities colluded with state authorities to permit imposition of a federal prison term as a sham separate sovereign; this was done knowingly to permit the expansive state conspiracy count to go forward to help prove murders on top of the federal charge."  The trial court "found nothing alleged nor any evidence that supports an inference that the state and federal authorities engaged in the conspiracy to trap the defendants by allowing them to plead to federal offenses that would not protect them from a subsequent state prosecution.  And in fact it was quite clear that the state had information and that they would be prosecuting, and the feds chose to ultimately step aside and get a very narrow plea for both defendants." [20]

Defendant does not challenge the prosecutor's declaration or otherwise present any basis for this court to override the trial court's determination.

Defendant cites *People v. Westbrook* (1996) 43 Cal.App.4th 220 (*Westbrook*), *United States v. Montgomery* (9th Cir. 1998) 150 F.3d 983 (*Montgomery*), and *Bartkus v. Illinois* (1959) 359 U.S. 121 (*Bartkus*) in support of his claim, but those cases do not assist him.  In *Westbrook,* the court termed the " 'sham separate sovereign' " argument a "narrow exception" to the rule that prosecutions undertaken by separate sovereigns are permissible.  (*Westbrook,* at pp. 224–225.)  In that case, as here, a prosecuting attorney averred that the prosecutions were separate, and the Court of Appeal rejected the claim they were not.  (*Id*. at p. 225.)  Similarly, in *Bartkus,* the United States Supreme Court rejected a showing of cooperation between federal and state prosecutors as supporting

---

[20] Here, the prosecutor filed a declaration under penalty of perjury stating (1) he did not consult with the United States Attorney's Office before obtaining the indictment; (2) the United States Attorney's Office did not consult with him before negotiating the federal guilty plea; and (3) the prosecutor was not influenced by the United States Attorney's Office in prosecuting the case against defendant.

"the claim that the State of Illinois in bringing its prosecution was merely a tool of the federal authorities, who thereby avoided the prohibition of the Fifth Amendment against a retrial of a federal prosecution after an acquittal." (*Bartkus,* at pp. 123–124.)

Finally, *Montgomery*, *supra*, 150 F.3d 983 is inapposite, as it did not involve convictions in different jurisdictions. It involved a single federal prosecution in which two counts of conspiracy—one to manufacture methamphetamine and one to distribute methamphetamine—were joined for trial. (*Id*. at p. 989.) Although double jeopardy principles prohibit splitting one conspiracy into multiple violations of one conspiracy statute, the *Montgomery* court rejected the defendant's claim the two conspiracies were actually only one conspiracy. (*Ibid*.)

In sum, the trial court did not err by denying defendant's double jeopardy claims.

## VII. Bifurcation of Gang Allegations Was Not Required.

Defendant contends the trial court abused its discretion by declining to bifurcate the gang allegations. We disagree. A trial court has the discretion to bifurcate gang allegations from the trial on the substantive charges. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048–1051 (*Hernandez*).) "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id*. at pp. 1049–1050.) The burden is on the party seeking bifurcation to

clearly establish there is a substantial danger of prejudice requiring the charges be separately tried. (*Id*. at p. 1050.)

Drawing an analogy between severance and bifurcation, our Supreme Court concluded that because of the policy considerations favoring joinder, "the trial court's discretion to deny bifurcation of a charged gang enhancement is similarly broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Hernandez, supra*, 33 Cal.4th at p. 1050.) Thus, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself—for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged—a court may still deny bifurcation." (*Ibid*.)

Here, the trial court denied the request to bifurcate the gang allegations because it found the gang testimony would be minimally prejudicial to defendant, who was not a gang member, but "highly relevant" to the issues at trial, "because the allegations are that [defendant] aided the Sureño gang and the F.A.I.M. gang by providing them with large quantities of methamphetamine." Referencing *Hernandez, supra*, 33 Cal.4th 1040, the trial court made specific findings it did not expect the evidence regarding the gang enhancements to be so inflammatory as to sway the jury to convict defendant regardless of his guilt, and did not believe there was a substantial danger of prejudice.

We see no abuse of discretion. Here the evidence of gang territory, membership, signs, symbols, beliefs and practices, criminal enterprises, and rivalries presented through both lay and expert witnesses related to defendant's coconspirators and was highly relevant to explain how defendant used the RST and FAIM gang networks to distribute drugs to end-users in west Contra Costa County. The evidence was also highly relevant to show the primary activities of the gangs, including drug dealing and the commission of other crimes. Much, if not all, of the evidence would have been relevant and admissible on the trial of the substantive charges even if the

61

gang allegations had been bifurcated. Under these circumstances, any inference of prejudice from joinder of the gang enhancement allegations was dispelled. No error appears.

## VIII. Severance of the Murder Counts or Overt Acts Related to Attempted Murder Was Not Required.

Prior to trial, the defense moved for severance of counts, requesting separate trials "for the two homicide and assault cases" on grounds of undue prejudice. Before ruling on the motion, the court asked defense counsel: "If the Court severed the attempted murder count, you mentioned that you would be prepared to go forward on the two homicides but what I'm trying to get clear in my mind is if I severed the attempted murder but I did not sever the conspiracy charge in Count One, would you be prepared to go forward and address overt acts 17, 18 and 19? It's not a charge, it's simply overt acts. You understand where I am going?" Counsel responded: " I understand where you're going, yes. Um . . . I think so. Just an act. I think so." Following further argument, and in light of ongoing discovery problems, the court ordered severance of the attempted murder charge, but not of the related overt acts. The court denied the motion with respect to the two murder counts.

On appeal, defendant argues the trial court abused its discretion based on the facts before it in denying the severance motion as to the murder counts, or at least as to the overt acts alleging the attempted murder.[21] Defendant also argues the joinder of counts and overt acts resulted in gross unfairness at trial amounting to a denial of due process and requiring reversal. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1296.) We disagree.

We review the court's ruling for abuse of discretion based on the facts before it at the time the motion was made. (*People v. Avila* (2006) 38 Cal.4th 491, 575.) "If the court's joinder ruling was proper at the time it was made, a reviewing court may reverse a

---

[21] Neither defense counsel's pretrial motion, nor appellate counsel's argument, mentions severance of the count alleging the attempted robbery of Guzman-Mercado, but we assume the severance motion was intended to cover it as well.

judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.] Even if the court abused its discretion in refusing to sever, reversal is unwarranted unless, to a reasonable probability, defendant would have received a more favorable result in a separate trial." (*Ibid*.)

The touchstone of a successful severance motion is the clear showing of "a substantial danger of prejudice" from joinder, and the party seeking severance bears that burden. (*People v. Vines* (2011) 51 Cal.4th 830, 855.) " ' " ' "The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " ' " (*Ibid.*)

We have already determined the evidence is sufficient to support a conviction for a single over-arching drug conspiracy. Although defendant maintains the conspiracy claim was unfounded, he acknowledges the single conspiracy claim provides the basis for cross-admissibility of evidence. Furthermore, we do not view the attempted murder facts as more inflammatory than the facts of the two murders "because it was the only street-shooting appellant assertedly committed himself." The Grockett and Guzman-Mercado murders were no less disturbing, and there was some evidence defendant was one of the people who actually shot Grockett. Some charges were not weaker or stronger than others; all depended to some extent on the veracity of coconspirators' statements. None of the charges carried the death penalty or turned the matter into a capital case. Finally,

63

defense counsel expressed the view, prior to trial, she could defend against the overt acts if the attempted murder were severed. These were the facts before the court at the time it ruled. No abuse of discretion appears.

Defendant asserts "error and gross trial prejudice are indeed shown here" but fails to support that assertion with any specifics. Given that most if not all of the evidence presented at the unitary trial would have been admissible at seriatim separate trials for murder, we see no reasonable probability defendant would have received a more favorable result if he had separate trials. (*People v. Avila, supra,* 38 Cal.4th at p. 575.)

## IX.    The Hearsay Statements of Coconspirators Were Admissible.

Defendant asserts the trial court erred by admitting statements made by nontestifying declarants Phillips, Delatorre and Primo under Evidence Code section 1223.[22] He also asserts the error violated his constitutional rights.[23] We disagree.

Defendant reiterates his argument that none of the statements were admissible as statements made in the furtherance of a single, ongoing conspiracy to sell drugs, because the evidence did not support the existence of such a conspiracy. We reject this argument because, as we have explained elsewhere, there was ample evidence that defendant was

---

[22] Evidence Code section 1223 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

[23] Defendant maintains the coconspirators' statements were so unreliable they "should have been excluded under state law and due process." "[T]he scope of the federal due process clause does not accomplish the constitutionalization of every issue arising under the applicable rules of evidence; to the contrary, the category of evidentiary infractions which violate due process will be construed narrowly." (*People v. Blanco* (1992) 10 Cal.App.4th 1167, 1175; *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Abilez* (2007) 41 Cal.4th 472, 503.) Defendant has not demonstrated how the statements at issue here, which we find were properly admitted, were nevertheless so unreliable as to violate due process.

64

the leader of an ongoing overarching conspiracy to distribute drugs for sale in west Contra Costa County during all relevant times.

Next, defendant argues even if there was an ongoing conspiracy, the statements were not admissible because they were (a) casual, and (b) made after the discrete crimes were committed. Because all of the discrete crimes, and all of the coconspirators' statements, occurred while the drug distribution conspiracy was ongoing, the statements were not made inadmissible by their timing. Defendant does not identify which statements were "casual." Warning Ruiz not to worry about the shooting of Guzman-Mercado, but to keep quiet, was not casual. Telling Ruiz the details of the plan to rob Guzman-Mercado and about the subsequent break-in at his apartment to steal methamphetamine was not casual either. Both statements furthered the conspiracy by instructing a trusted operative about how to act, and keeping him in the loop of the conspiracy.

Defendant's third claim is that Coby Phillips's statement to Stacey Taylor about his impending meeting with others to kill Grockett was admitted erroneously before there was any evidence, independent of the statement, of the conspiracy to kill him. However, Evidence Code section 1223 expressly vests in the trial court the discretion to vary the order of proof. That discretion was not abused here. Furthermore, there was ample evidence from which it could be inferred that the killing was part of the overall conspiracy to distribute and sell drugs, and furthered that conspiracy.

Defendant's fourth claim is: "[I]f admissibility based on smaller conspiracies to murder or rob were considered, there is no evidence independent of the statements appellant was a member of the smaller conspiracies (to kill Grockett or rob anyone) either." Since admissibility was plainly based on the larger conspiracy to distribute drugs for sale, defendant's fourth claim is not well taken.

Finally, defendant argues all his contentions apply with equal force to Sergio's preoffense statement that Hernandez was a snitch. For all the reasons we reject his earlier

65

contentions, we reject this one as well. The conspiracy was ongoing, the statement was not casually made but rather spurred the attempt on Hernandez's life, and the statement was made in the furtherance of the overarching conspiracy to distribute drugs for sale. No error appears.

## X.   The Instructions on Murder Liability Premised on Drug Conspiracy Were Correct.

The trial court instructed the jury on liability for murder under the doctrine of natural and probable consequences, an extension of aider and abettor liability. (CALCRIM No. 402.) Defendant argues this instruction violates his state and federal rights to due process, a fair trial, and the right to a jury determination beyond a reasonable doubt on all issues because, unlike CALCRIM No. 417 on liability for coconspirators' acts (which was also given), CALCRIM No. 402 does not limit liability to acts in furtherance of a conspiracy. Defendant acknowledges the rule he challenges is the law in this state. (*People v. Brigham* (1989) 216 Cal.App.3d 1039, 1045.) Moreover, our Supreme Court recently discussed the differences between aider and abettor liability in its natural and probable consequences permutation and coconspirator liability, and explained the reasons for those differences in terms that are dispositive of defendant's unfairness-based constitutional argument.

In *Smith, supra*, 60 Cal.4th 603, the defendant was tried and convicted of two second degree murders on the theory he aided and abetted the actual shooters in committing the target crimes of disturbing the peace and assault or battery, and the murders were the natural and probable consequence of those target crimes. (*Id.* at pp. 611–612.) Under the natural and probable consequences doctrine, "[a]n aider and abettor is guilty not only of the intended, or target, crime but also of any other crime a principal in the target crime actually commits (the nontarget crime) that is a natural and probable consequence of the target crime. [Citations.] 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of

66

that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' " (*Id.* at p. 611.)

The trial court in *Smith* instructed the jury with CALCRIM No. 402, which included the following sentence: "If the murder . . . was committed for a reason independent of the common plan to commit the disturbing the peace or assault or battery, then the commission of murder . . . was not a natural and probable consequence of disturbing the peace or assault or battery." (*Smith, supra*, 60 Cal.4th at p. 612.) The *Smith* court determined that sentence was incorrect, notwithstanding its inclusion in a CALCRIM instruction. (*Id*. at p. 614.) "To establish aiding and abetting liability under the natural and probable consequence doctrine, the prosecution must prove the nontarget offense was reasonably foreseeable; it need not *additionally* prove the nontarget offense was not committed for a reason independent of the common plan to commit the target offense." (*Ibid*.)

The *Smith* court concluded the erroneous limitation on aider and abettor liability for natural and probable consequences in CALCRIM No. 402 was probably imported from case law involving coconspirator liability. (*Smith, supra*, 60 Cal.4th at p. 614.) Under a coconspirator theory of liability, each coconspirator " ' "is responsible for everything done by his confederates, which follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original design or common plan. Nevertheless, the act must be the ordinary and probable effect of the wrongful act specifically agreed on, so that the connection between them may be reasonably apparent, *and not a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design.*" ' " (*Ibid.*, quoting from *People v. Kauffman* (1907) 152 Cal. 331, 334 (*Kauffman*), *People v. Luparello* (1986) 187 Cal.App.3d 410, 444, *People v. Werner* (1940) 16 Cal.2d 216, 223; see *Pinkerton v. United States* (1946) 328 U.S. 640, 646, *Salinas v. United States* (1997) 522 U.S. 52, 63–64.)

67

However, although aider and abettor and coconspirator liability both involve joining with others in a criminal enterprise, they are not coextensive or interchangeable. Citing *People v. Brigham, supra*, 216 Cal.App.3d 1039 with approval, our Supreme Court explained: "Because a conspirator can be liable for a crime committed by any other conspirator, and the defendant need not *do* (or even encourage) anything criminal except agree to commit a crime, it is reasonable to make a conspirator not liable for another conspirator's crime that is ' "a fresh and independent product of the mind of one of the confederates outside of, or foreign to, the common design." ' (*Kauffman, supra,* 152 Cal. at p. 334.) But aiding and abetting is different. An aider and abettor is someone who, with the necessary mental state, 'by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.] Because the aider and abettor is furthering the commission, or at least attempted commission, of an actual crime, it is not necessary to add a limitation on the aider and abettor's liability for crimes other principals commit beyond the requirement that they be a natural and probable, i.e., reasonably foreseeable, consequence of the crime aided and abetted. If the prosecution can prove the nontarget crime was a reasonably foreseeable consequence of the crime the defendant intentionally aided and abetted, it should not additionally have to prove the negative fact that the nontarget crime was not committed for a reason independent of the common plan. [¶] To be sure, whether an unintended crime was the independent product of the perpetrator's mind outside of, or foreign to, the common design may, if shown by the evidence, become *relevant* to the question whether that crime was a natural and probable consequence of the target crime. In a given case, a criminal defendant may argue to the jury that the nontarget crime was the perpetrator's independent idea unrelated to the common plan, and thus was *not* reasonably foreseeable and *not* a natural and probable consequence of the target crime. But that would be a factual issue for the jury to resolve [citation], not a separate legal requirement." (*Smith, supra*, 60 Cal.4th at p. 616–617; see *Nye & Nissen v. United States* (1949) 336 U.S. 613, 618.)

68

Here, the trial court's adaptation of CALCRIM No. 402 included the same limiting language disapproved in *Smith*: "If the murder . . . was committed for a reason independent of the common plan to commit the crime of conspiracy to commit sale of controlled substances and/or attempted robbery, then the commission of murder . . . was not a natural and probable consequence of the crime of conspiracy to commit sale of controlled substances and/or attempted robbery." Here, as in *Smith*, the erroneous language could only have helped defendant. (*Smith, supra*, 60 Cal.4th at p. 617.) In light of our Supreme Court's explanation of the differences between aider and abettor and coconspirator liability, we reject defendant's contention CALCRIM No. 402 is incorrect because it does not limit liability to acts in furtherance of a conspiracy. The two theories of liability are distinct, and engrafting an "in furtherance of" limitation onto aider and abetting liability is inconsistent with *Smith*'s holding and existing law.

Defendant argues the connection between an ongoing conspiracy to sell controlled substances and murder was too attenuated "to sustain the more serious conviction" because the prosecution did not make out its case for an ongoing drug conspiracy involving defendant and his confederates. To the extent defendant is rearguing the sufficiency of the evidence to support an overarching conspiracy to distribute controlled substances in the guise of instructional error, we have already rejected his contention and will not revisit that issue here.

Defendant also argues the evidence of defendant's participation in a drug distribution conspiracy did not provide an "adequate foundation" for instructions on coconspirator liability *or* aider and abettor liability under the natural and probable consequences doctrine. We disagree. In the context of evaluating whether there was a sufficient evidentiary foundation for giving an instruction, substantial evidence means " ' "evidence sufficient to 'deserve consideration by the jury.' " ' " (*People v. Wilson* (2005) 36 Cal.4th 309, 331.) There was certainly enough evidence of an ongoing conspiracy to sell drugs, and a separate conspiracy to commit robbery, to warrant

69

instructions on whether homicide was a natural and probable consequence of such conspiracies.  It was for the jury to decide, as a factual matter, whether the murders were "a natural and probable consequence of the common plan or design of the conspiracy" that "further[ed] the common plan," as stated in CALCRIM No. 417, or a natural and probable consequence of aiding and abetting a conspiracy to sell drugs or rob a drug dealer (the "target crimes"), under CALCRIM No. 402.  (*Smith, supra*, 60 Cal.4th at p. 617; *Chiu, supra*, 59 Cal.4th at p. 162.)

Defendant's reliance on *People v. Price* (1991) 1 Cal.4th 324, 443 (*Price*) and *People v. Butts* (1965) 236 Cal.App.2d 817, 836–837 (*Butts*), is misplaced.  In *Price*, the defendant complained of the trial court's failure to instruct the jury that Myers, one of the witnesses against him, could be found vicariously liable as an aider and abettor for one of the murders with which the defendant was charged.  (*Price,* at pp. 441–442.)  The court considered whether "the evidence before the jury plainly would have supported a finding that Myers intentionally aided the commission of an offense of which a crime such as the Barnes murder was a natural and probable consequence." (*Id.* at pp. 442–443.)  The court concluded no such instruction was required because, among other reasons, the "evidence that Myers assisted the AB by smuggling drugs and knives into state prisons and by carrying messages . . . show[ed], at most, that Myers aided and abetted illegal drug activity and in-prison violence; the killing of an AB defector's relative, outside of prison, is not a natural and probable consequence of such crimes." (*Id.* at p. 443.)

While the foregoing sentence appears to be categorical, in context it was clearly meant to summarize the evidence adduced at Price's trial.  It suggests, perhaps, that murder is not the natural and probable consequence of low-level assistance given by persons such as Beckwith or Taylor. We do not take it to mean that murder can never be a natural and probable consequence of drug smuggling by a principal player in the grander scheme.  Here, there was ample evidence that defendant and his confederates were involved in a highly profitable, vertically integrated drug-selling scheme that

70

depended on securing product to sell, by purchase or by robbery, and further depended on maintaining respect and control by punishing underlings and others who snitched, balked at paying full price, or otherwise threatened members of the organization.

In *Butts*, the Court of Appeal reversed the defendant's conspiracy conviction for insufficient evidence, and then reversed his involuntary manslaughter conviction for a homicide committed by someone else, because Butts's conviction was premised on coconspirator liability. (*Butts, supra*, 236 Cal.App.2d at p. 835.) Nevertheless, the Court of Appeal concluded Butts theoretically could be retried for the homicide on an aiding and abetting theory. (*Ibid*.) However, in dicta intended for the "guidance of the parties and the trial court," the appellate court observed: "In view of the present record, the possibility that the prosecution may muster up enough evidence to warrant jury consideration of Butts' liability as an aider and abettor seems quite remote. Perhaps the prosecution has other testimony and other witnesses. In any event we do not preclude a retrial if the prosecution wants one." (*Id.* at pp. 835–836, fn. 3.) Here, by contrast, the evidence warranting the jury's consideration of defendant's derivative liability for the homicides of Grockett and Guzman-Mercado comfortably supported instructions on coconspirator and aiding and abetting theories of liability. The trial court did not err in instructing on coconspirator or aiding and abetting liability, except to the extent it incorporated *Chiu* and *Smith* errors.

## XI. An Instruction on Multiple Conspiracies as An Alternative to A Single Conspiracy Was Not Required.

The trial court denied defendant's request for an instruction or instructions on multiple conspiracies, stating: "It seems very clear to this Court that the one eagle [*sic*] among all these conspirators was to make money by selling controlled substances. That is, in this Court's opinion, the main focus of this conspiracy. None of them appear to be significant users. They enjoyed the fruits, that is, the cash of the drug trade."

On appeal, defendant argues the trial court violated his constitutional rights and committed error requiring reversal by refusing to instruct the jury to determine whether

71

there were multiple conspiracies or only one "for purposes of both murder liability and hearsay issues." This argument apparently encompasses the undeveloped claims that the trial court should have instructed the jury to (1) unanimously decide whether there was one conspiracy or "a few smaller discrete drug conspiracies or smaller discrete conspiracies to kill or rob"; and (2) further decide whether key hearsay statements were admissible under the coconspirator exception "if there was no broader conspiracy and the hearsay was not in furtherance of a smaller discrete conspiracy." We glean defendant believes the asserted error requires reversal of all counts.

Ordinarily, the error asserted here arises when the defendant has been convicted of multiple conspiracies but the evidence supports only one conspiracy conviction. (See *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1669–1671[no error]; *People v. Jasso* (2006) 142 Cal.App.4th 1213, 1220–1223.) Where such an error is shown, the remedy is reversal of the duplicative conspiracy convictions. (*People v. Jasso,* at p. 1223.) *Jasso* is not authority for the proposition that substantive counts must be reversed as well.

In addition, "[a]ssuming that more conspiracy counts could have been charged under the facts, the decision to charge defendant with only one conspiracy count was a prosecutorial charging discretion that we do not review. The exercise of that discretion involves questions of prosecutorial policies and judgment, not questions of fact for the jury to determine. [¶] Moreover, we fail to see how charging defendant with one count of conspiracy, instead of multiple counts, could prejudice defendant. Any error would therefore be harmless. [¶] Furthermore, assuming there were multiple conspiracies, we do not see how the existence of the uncharged conspiracies can result in the reversal of a guilty finding in the one conspiracy that was charged. If the evidence submitted to the jury supports the guilty finding on the charged conspiracy, the fact that the same evidence might also have supported other conspiracies, which were not charged, is of no consequence to the issue of innocence or guilt on the charged conspiracy." (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553 (*Vargas*); see *People v. Skelton* (1980)

72

109 Cal.App.3d 691, overruled on another point in *People v. Figueroa* (1986) 41 Cal.3d 714, 731.)

Although the matter is not settled, we assume the question whether one or more conspiracies are shown by the evidence is a question of fact for the jury. (*People v. Meneses, supra*, 165 Cal.App.4th at pp. 1668–1669; cf. *People v. Figueroa*, *supra*, 41 Cal.3d 714 [whether instrument is a security is question of fact].) "A trial court is required to instruct the jury to determine whether a single or multiple conspiracies exist only when there is evidence to support alternative findings." (*Vargas, supra*, 91 Cal.App.4th at p. 554.)

Here, no instruction was required because the evidence did not support alternative findings, i.e., one conspiracy *or* many. *Vargas* is instructive in this regard. The defendant, Vargas, a member of the prison gang Nuestra Familia (NF), was convicted of murder, conspiracy to commit murder over a two-and-a-half-year period, other substantive crimes, and gang enhancements. (*Vargas*, *supra*, 91 Cal.App.4th at pp. 517–518.) Rejecting the defendant's argument an instruction on multiple conspiracies was required, the court observed: "[T]he record evidence points only to one conspiracy—the agreement to establish the NF as a criminal gang to commit murder, robbery, burglary, extortion, and drug trafficking, among other crimes. Within that umbrella conspiracy were subconspiracies to commit specific crimes. However, the commission of the specific crimes, and the drawing up of plans required to commit them, were all in pursuance of the overriding purpose of the NF, which was to establish power through the use of crime, force, and fear, and to use that power to further strengthen and perpetuate itself by killing its enemies, raising money for the gang, and instilling obedience and discipline among its members by killing members who break its rules. Thus, Rosas was killed because he had 'snitched on Pablo Pena, Panther.' The decision to kill Rosas, being one in furtherance of the overriding purpose of the conspiracy, was part of the

73

overall conspiracy, and hence cannot be the basis for filing a separate charge of conspiracy." (*Id.* at p. 553.)

This case is not fairly distinguishable from *Vargas*. The evidence here, no less than in *Vargas*, showed " 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy. [Citation.] Performance of separate crimes or separate acts in furtherance of a conspiracy is not inconsistent with a 'single overall agreement.' " (*Vargas, supra*, 91 Cal.App.4th at pp. 553–554.) The trial court did not err in determining that, to the extent the evidence showed subagreements to commit discrete crimes, those crimes were committed in furtherance of the larger conspiracy to distribute drugs for sale in west Contra Costa County. Put differently, substantial evidence deserving of the jury's consideration was not presented to support the hypothesis there was *either* one overall agreement to distribute drugs, *or* a series of unrelated mini-conspiracies to sell drugs, rob drug dealers, kill them or kill snitches involving defendant and the same cast of characters. (*People v. Wilson, supra*, 36 Cal.4th at p. 331.) No error appears.

## XII.    A Pinpoint Instruction on Buyer-Seller Relationships Was Not Required.

Defendant contends he was entitled to an instruction that "the buyer and seller in a drug transaction are *not* conspirators or accomplices because the crime requires at least two persons." (Italics added.) The trial court was inclined to give the instruction with respect to accomplices, but not conspirators, because "there could be instances in which a buyer and seller could be coconspiring as part of a larger operation." In the end, the trial court decided not to give any instruction along those lines in connection with the conspiracy charge. However, for the purpose of determining whether defendant, having committed the murders in association with a criminal street gang, personally discharged a firearm causing death, the court reinstructed the jury on who is an accomplice. In connection with those accomplice instructions, the trial court did instruct that "a

74

purchaser of controlled substances during a sales transaction is not the accomplice of a person selling controlled substances during the sales transaction."

Defendant's argument is supported by a line of federal cases in the Seventh Circuit, which holds that a "mere buyer-seller relationship is insufficient to establish membership in a conspiracy." (See, e.g., *United States v. Meyer* (7th Cir. 1998) 157 F.3d 1067, 1074; *United States v. Larkins* (7th Cir. 1996) 83 F.3d 162, 167; *U.S. v. Lechuga* (7th Cir. 1993) 994 F.2d 346, 349 (*Lechuga*).) The rational for this rule is that "[a] conspiracy is not merely an agreement. It is an agreement with a particular kind of object—an agreement to commit a crime. When the sale of some commodity, such as illegal drugs, is the substantive crime, the sale agreement itself cannot be the conspiracy, for it has no separate criminal object. What is required for conspiracy in such a case is an agreement to commit some other crime beyond the crime constituted by the agreement itself." (*Lechuga*, at p. 349.) However, "the existence of a continuing relation, implying an agreement with an objective beyond a simple purchase and sale and thus an agreement separate from the sale itself" will support the finding of conspiracy. (*Id.* at p. 350.)

As the *Lechuga* court explained: "The critical issue is whether, on the one hand, the relationship between Lechuga and Pagan is properly characterized as that of a spot seller and a spot buyer; or, on the other hand, whether the sale was from Lechuga to Pinto with Pagan functioning as a go-between, facilitator, sales agent, and general helper. If, knowing that Lechuga was a drug dealer, Pagan assisted him in distributing drugs to at least one dealer farther down the chain of distribution, namely Pinto, then Lechuga and Pagan were coconspirators." (*Lechuga*, *supra*, 994 F.2d at p. 350; see *United States v. Herrera* (7th Cir. 1995) 54 F.3d 348, 353–354 ["*Lechuga* stands for the proposition that mere evidence of one sale of narcotics, without more, is inadequate to support a conviction of the buyer and seller for conspiracy to distribute narcotics."].)

The rule in California is stated differently, but draws the same distinction. " 'The purchaser of narcotics is not an accomplice of the seller, as the offense of the purchaser is

75

"possession" and not "selling." [Citations], *exceptions to the above view of an accomplice are recognized in case of a conspiracy . . . .* [Citation.] In *People v. Lima* (1944) 25 Cal.2d 573, 154 P.2d 698, the court recognized: 'It is now settled in this state that the thief and the receiver of stolen property are not accomplices [citation].' (25 Cal.2d at p. 576.) It noted a well-established exception to the general rule, and concluded: 'Where, as here, the prosecution evidence discloses the existence of a conspiracy or agreement whereby the principal prosecution witnesses were to steal and defendant was to purchase the stolen property, it is both logical and reasonable to hold that they are accomplices in the offense or offenses resulting from execution of such plan.' " (*People v. Chrisman* (1967) 256 Cal.App.2d 425, 437–438.)

The trial court's instincts were correct. It makes no sense to say, in the context of a for-profit drug distribution ring involving people at the top of the chain who acquire large quantities of drugs and sell smaller quantities to intermediate sellers, who in turn sell even smaller quantities to street sellers for ultimate distribution to users, that sellers and purchasers are not accomplices or coconspirators. Even the Seventh Circuit cases recognize the difference between a seller and purchaser of drugs who are part of a larger conspiracy, and a seller and a purchaser in a one-to-one sale situation. In *Meyer, supra*, 157 F.3d 1067, the court found that one defendant was not entitled to a buyer-seller instruction because the evidence showed he was in more of a profit sharing relationship, whereas the second defendant was entitled to the instruction because the evidence showed he was merely a "customer." (*Id*. at pp. 1075–1076.) Here, an evidentiary foundation for the instruction defendant requested was lacking, and such an instruction did not, in any case, accurately reflect California law. No error appears.

## XIII. There Was No Prosecutorial Misconduct.

Defendant argues the prosecutor engaged in several instances of prejudicial misconduct during opening statement, direct examination, and closing argument. Specifically, defendant argues the prosecutor (1) made improper references to Mexican

cartels in opening statement; (2) asked improper questions of his gang expert about the gang intent underlying the Grockett killing; (3) personally "vouched" for the deals he gave his witnesses; and denigrated defense counsel by arguing "the defense . . . despises" witness relocation programs because "[i]t makes business difficult."

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.] '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 960; see *People v. Prieto* (2003) 30 Cal.4th 226, 260.) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970, overruled on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)  As we explain below, none of the asserted instances of improper behavior meet these standards and we therefore reject defendant's claims of prosecutorial misconduct under state and federal law.

### A.  *Mexican Cartels.*

Defendant asserts that during opening argument, the phrase "Mexican cartels" was briefly displayed on a Microsoft PowerPoint slide.  The prosecutor told the jury Jamie Beckwith, defendant's girlfriend, "knew the Defendant had a connection to an organization in Sinaloa and that he sold methamphetamine 20 to 30 pounds at a time." One of his big customers was Coby Philips and the rest of FAIM.  Defendant had the

77

Mexican connection, FAIM had the customers and "so they were in business together. . . selling drugs."

Following opening statements, defense counsel moved for a mistrial on the ground, among others, the prosecutor had made thinly veiled references to the Sinaloa cartel in violation of the court's pretrial order. The court reminded counsel it had ruled the word "cartel" was out of bounds, but the words "association" or "organization" were permissible. The prosecutor apologetically admitted the word "cartel" was used on the PowerPoint slide, but believed he did not use the word "cartel" in his opening statement, a fact which the appellate record bears out.[24] The court did not hear the word spoken or recall seeing it on the slide, or know "how quickly or long it was up on the screen before [the prosecutor] moved on." The court offered to admonish the jury to disregard the slide, but counsel was not interested in an admonition. In the end, the trial court denied the motion for mistrial without prejudice to counsel's further research on prejudice due to the use of the word "cartel." Counsel did not present further research.

We see no prejudicial error. The prosecutor's inadvertent use of the word "cartel" on one slide in a slide show, *if* he used it, could not have affected the verdict in this case.

**B. *Questions Asked by the Prosecutor of the Gang Expert and Defendant.***

Defendant assigns as misconduct the prosecutor's entire line of inquiry designed to elicit Detective Todd Tribble's expert opinion on whether Grockett's killing furthered gang objectives. Specifically, he objects to the following question, which was withdrawn after defense counsel objected: "In your opinion would 'Primo' and Jose Vega-Robles have committed the crime [of shooting Grockett] in association with F.A.I.M with the specific intent to further criminal conduct?"

" 'The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct.' " (*People v. Bell* (1989) 49 Cal.3d 502, 532.) For purposes of

---

[24] The trial court made copies of the slide show part of the record on appeal. We have been unable to locate a slide using the word "cartel." One slide states: "Defendant and his brother imported drugs from Sinaloa in Mexico."

the defendant's argument, we assume it is improper to ask for an expert's "opinion of the knowledge or intent of a defendant on trial," and to name the defendant, as opposed to a hypothetical person, in a question. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 946, 947, fn. 3 ["[T]here is a difference between testifying about specific persons and about hypothetical persons."]; but see *People v. Prince* (2007) 40 Cal.4th 1179, 1224; *People v. Vang* (2011) 52 Cal.4th 1038, 1048, fn. 4.)

"Also, an expert may not offer an opinion regarding whether the defendant had the capacity to form the intent required for the crime, or whether the defendant actually did form the requisite intent." (*People v. Smithey, supra,* 20 Cal.4th at pp. 960–961; *People v. Samayoa* (1997) 15 Cal.4th 795, 835–837.) However, where gang activity is relevant to a case, the use of expert opinion testimony to prove various aspects of gang activity, including those which may be highly probative of the defendant's intent, is well-established. (*People v. Gonzalez, supra*, 38 Cal.4th at p. 946.)

Here, such evidence was relevant both to the substantive conspiracy charge and the gang enhancements. The objectionable question was withdrawn, was not asked again, and was never answered. The permissible inference to be drawn from Detective Tribble's entire testimony—that the persons who carried out the Grockett killing did so with the intent and for the purpose of benefitting the FAIM gang by eliminating a rival drug dealer whose sales activity threatened the profitability of FAIM's primary activity (trafficking in methamphetamine)—was not objectionable, or prejudicial.

The prosecutor's statement in closing argument that Tribble opined the shooting was committed with the specific intent to benefit the FAIM gang, may have overstated the case. However, as a shorthand summary of the conclusions the jury was entitled to draw from Tribble's testimony, it was not improper argument. Likewise, a PowerPoint slide stating Tribble "[h]olds the opinion that this was done in association with gang and specific intent to benefit the gang" accurately stated Tribble's opinion and was permissible.

79

Defendant also argues the prosecutor committed misconduct by asking Officer Goldberg if defendant ever said he wanted to "make a deal." Goldberg answered that he did. Counsel's failure to object to this question and answer constitutes waiver. Counsel did object to a follow-up question asking whether Goldberg told defendant he was not "in a position to make a deal," to which Goldberg answered, "That's correct." The court sustained the objection and struck the question and answer. The court denied a subsequent motion for mistrial, noting the prejudicial effect, if any, was extremely low, and the unobjected-to testimony was relevant to show consciousness of guilt. We agree.

### C. Vouching for the Credibility of Prosecution Witness.

Defendant argues the prosecutor committed misconduct in closing argument by personally vouching for the plea deals prosecution witnesses received. During opening statement, the prosecutor informed the jury that Ricardo Ruiz was originally charged with being an accessory, but he "got a three-year deal to testify." Others, including Clayton Cates, "got deals as well" to testify in defendant's case and other cases in Solano County. "Most of the witnesses will have what we call 'use immunity.' That means nothing they say here can be used against them in another proceeding." Covey, Taylor, Cates, Ruiz, and Hernandez had been relocated as a safety precaution, "[a]nd money has been spent to get them out of here so we can have testimony in this case. That decision was made by the District Attorney's Office. It's part of our job to decide which witnesses to call and to analyze the case and charging is a function of the District Attorney's Office. It's not the Court's call who gets charged, it's not the defense call. They might do it differently if it was up to them but it's our job to decide based on the evidence in front of us and the policy and so on down the line to decide who to charge and who to call as a witness."

After opening statement, counsel moved for mistrial on the ground the prosecutor improperly vouched for the credibility of witnesses who had been granted immunity by telling the jury it was his decision to grant immunity. The court did not see anything

80

improper in the prosecutor's statements about the decision to grant immunity and denied the motion.

During closing argument, the defense counsel objected when the prosecutor reminded the jury the deals were made by him, and he did not apologize for them. The objections were overruled because the court believed the comments were appropriate. Defense counsel again objected when the prosecutor said "the deals make sense," and the jury could consider them in terms of evaluating the testimony and why the deals were made.

"Impermissible vouching occurs when 'prosecutors [seek] to bolster their case "by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it." [Citation.] Similarly, it is misconduct "to suggest that evidence available to the government, but not before the jury, corroborates the testimony of a witness." ' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1207.) The prosecutor's comments about the deals offered the witnesses did not suffer from these vices.

In fact, the nature of the plea deals was the proper subject of disclosure to the jury. "[T]he existence of a plea agreement is relevant impeachment evidence that must be disclosed to the defense because it bears on the witness's credibility. [Citation.] . . . '[W]hen an accomplice testifies for the prosecution, full disclosure of any agreement affecting the witness is required to ensure that the jury has a complete picture of the factors affecting the witness's credibility.' " (*People v. Fauber* (1992) 2 Cal.4th 792, 821; *People v. Bonilla* (2007) 41 Cal.4th 313, 337.) The prosecutor's comments were not "vouching" and the objections were properly overruled.

### D. Disparaging Defense Counsel.

Finally, defendant contends the prosecutor disparaged defense counsel by saying: "Why during questioning of the witnesses did the defense have such a problem with the necessity of a State Witness Relocation Program? [¶] Why was that a problem? [¶]

Accusing the witnesses of being bought and paid for." Defense counsel objected that the prosecutor's argument misstated the law, was argumentative and improper. The court overruled the objections. She did not object when the prosecutor concluded by saying the defense despises the relocation program because it makes business difficult. Outside the presence of the jury, defense counsel moved for mistrial on the ground the prosecutor's comments amounted to a combination of vouching for the witnesses and attacking defense counsel.

The prosecutor's comments did not personally attack defense counsel or suggest she was being deceptive or tricky, nor is it reasonably likely the jury interpreted them in that way. In our view, the argument asked the jury to reflect on whether the witnesses' placement in a relocation program affected their credibility. No misconduct occurred. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1167.)

## XIV.  There Was No Cumulative Error.

Defendant asserts the cumulative effect of the errors discussed above deprived him of a fair trial and requires reversal of the judgment, in whole or in part. "A defendant is entitled to a fair trial, not a perfect one." (*People v. Mincey* (1992) 2 Cal.4th 408, 454.) Nevertheless, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) We have determined that defendant's conviction for murder in count 2 must be reversed for *Chiu* error. Also, we have found that some of the gang experts' was erroneously admitted in light of *Sanchez*, *supra*, 63 Cal.4th 665, but concluded the experts' overall testimony was not prejudicial. Accordingly, there is no prejudice to cumulate.

## XV.  The Abstract of Judgment Must Be Corrected.

The parties agree the indeterminate abstract incorrectly states the murders were committed in 2009 and must be corrected to reflect the correct date, 2004. We concur.

## DISPOSITION

The judgment is reversed as to count 2, the murder of Darrell Grockett. The matter is remanded for the People to decide whether to accept reduction of count 2 to second degree murder, or to retry defendant for the first degree murder of Darrell Grockett under theories other than natural and probable consequences. The trial court is directed to correct the indeterminate abstract of judgment to reflect the murders were committed in 2004 and transmit the amended abstract to the Department of Corrections. In all other respects the judgment is affirmed.

_____
Dondero, J.

We concur:


_____
Margulies, Acting P.J.


_____
Banke, J.


A137121  *People v. Vega-Robles*

| | |
|---|---|
| Trial Court | Contra Costa County Superior Court |
| Trial Judge | Hon. Brian Haynes |
| Counsel for Plaintiff and Appellant Jose Vega-Robles | Joseph Shipp By appointment of the Court of Appeal under the First District Appellate Project, Independent Case System |
| Counsel for Respondent People of the State of California | Kamala D. Harris, Attorney General Dane R. Gillette    Chief Assistant Attorney General Gerald A. Engler    Senior Assistant Attorney General Jeffrey M. Laurence    Supervising Deputy Attorney General Christopher W. Grove    Deputy Attorney General |